DICKINSON ARMS–REO, L.P., doing business as Dickinson Arms Apartments, GSSW, Limited Partnership, GSSW–REO Ownership Corporation, and Insignia Management Group, Appellants,

v.

Joe Winston CAMPBELL, individually and as Administrator of the estate of Joe Darin Campbell, Deceased, and Lillie Campbell, Appellees.

No. 01–97–01190–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 23, 1999.

---

Mike Johanson, Sugar Land, for Appellants.

Roy Talmadge Hammock, Trey Apffel, III, Texas City, for Appellees.

Panel consists of Justices MIRABAL, O'CONNOR, and NUCHIA.

## OPINION

MIRABAL, Justice.

This is an appeal of a money judgment in a premises liability case that involved a car-jacking and murder in the parking lot of an apartment complex. The plaintiffs' complaint was that the landlord failed to provide adequate security against criminal conduct. The trial court rendered judgment on the jury verdict in favor of the plaintiffs in the amount of $341,000. We affirm.

## BACKGROUND

On June 15, 1994, the decedent, Joe Darin Campbell, and his girlfriend, Jenny Cady, were at a club. They left the club at about 12:00 midnight in separate cars. Cady asked Campbell to meet her at her apartment at the Dickinson Arms Apartments that night. Cady was delayed in going home because she had to take a friend home first. At about 2:30 a.m. she arrived at her apartment complex and learned that Campbell had been murdered.

On that same evening, 16–year–old Donald Nichols and 16–year–old Jeremy Gartrell went to the Dickinson Arms Apartments to visit Gartrell's friend, Jesse, who lived in apartment no. 69 with several other individuals, including Stacy Hughes. Gartrell had a .22 caliber pistol with him. According to Nichols, Jesse and some other guys who lived at Dickinson Arms were members of either the Brown Assassins or LaRaza gangs. Approximately 15 to 20 people had gathered at Jesse's apartment for a Brown Assassins get-together.

As Gartrell and Nichols were leaving Jesse's apartment, they saw Campbell in his pickup truck in a parking space. Gartrell told Nichols that he was going to "jack" the truck. Gartrell and Nichols

split up, and, as Nichols walked away, he heard Gartrell and Campbell arguing and heard the gun go off. Nichols was afraid and began to run. Gartrell then drove up in Campbell's truck and told Nichols to get in. Nichols got in the truck and they drove away.

Gartrell pled guilty to murder and was sentenced to 50 years confinement. Nichols pled guilty to aggravated robbery and was sentenced to 25 years confinement.

Campbell's mother, Lillie Campbell, and his father, Joe Winston Campbell, individually and as administrator of his son's estate, filed suit against the owners of Dickinson Arms Apartments, and against the company that managed the apartments. ("Dickinson Arms" or defendants). Plaintiffs alleged negligence and gross negligence on the part of defendants. The court granted a directed verdict in favor of defendants on the issue of gross negligence, and that part of the judgment has not been appealed. With regard to the negligence cause of action, plaintiffs pled the following:

> On the occasion in question, and as described above, Defendants, acting by and through their agents, servants and/or employees, owed JOE DARIN CAMPBELL, Deceased, a duty to take reasonable steps to protect him from intentional injuries caused by third parties if said Defendants, acting by and through their agents, servants and/or employees, knew or had reason to know, from what they had observed or from past experience, that criminal acts were likely to occur, either generally or at some particular time, such as the incident in question. Despite the high crime rate in the area and the repeated incidents of criminal activity at the Dickinson Arms Apartments, Defendants failed to adequately maintain the premises as to make it reasonably safe for tenants and their guests such as JOE DARIN CAMPBELL. Defendants knew or had reason to know that the premises in question were unsafe and

created a dangerous environment for Plaintiff. The evidence will show the Defendants failed to adequately warn tenants and their guests of the dangers present at Dickinson Arms Apartments. The negligence of the Defendants includes, but is not limited to, the failure to maintain the property and common areas in a reasonably safe manner, the failure to provide and/or implement reasonable security measures and devices, the failure to make reasonable inquiry and investigation into the history of crime and criminality on or about the subject premises, the failure to implement adequate policies and procedures to be followed by the Defendant's agents and/or employees relating to security issues, and the failure to remove, eliminate or abate the dangerous conditions present. Such conduct constitutes negligence and was a proximate cause of Mr. Campbell's death and the injuries and damages sustained not only by Mr. Campbell, but also by his parents, JOE WINSTON CAMPBELL and LILLIE CAMPBELL.

The negligence issue was tried to a jury, which found in favor of plaintiffs. This appeal followed.

## DISCUSSION

### Invitee Status

In their first issue, defendants assert the trial court erred in ruling that decedent Campbell was an "invitee" as a matter of law. Defendants contend that Campbell was a "licensee" only.

The Texas Supreme Court has clearly held that the duty owed by a landlord to its tenant is the duty owed to an invitee, and this duty of the landlord extends to the tenant's invited guests. *Parker v. Highland Park, Inc.,* 565 S.W.2d 512, 513–15 (Tex.1978): Even though the tenant was not accompanying Campbell at the time of the car-jacking, the evidence is uncontroverted that Campbell was present at the apartments as a result of being

invited as a guest by his girlfriend, a tenant of the apartments. Therefore, Campbell was an "invitee" as a matter of law.

We overrule issue one.

### Sufficiency of Evidence— Proximate Cause

In their second issue, defendants assert the evidence was insufficient to support the jury's finding that defendants' negligence was a proximate cause of the incident. We apply the usual standards of review for addressing legal and factual insufficiency of evidence claims. See *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988) (legal sufficiency of evidence standard of review); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (factual sufficiency of evidence standard of review).

The jury charge included the following jury questions and relevant instructions (jury's answers are shown in parentheses):

"NEGLIGENCE," when used with respect to the conduct of **DICKINSON ARMS–REO, L.P.** and **INSIGNIA MANAGEMENT GROUP** as the owner and management company for the Dickinson Arms Apartments means the failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition that the owner or occupier knows about or in the exercise of ordinary care should know about.

. . .

"ORDINARY CARE," when used with respect to the conduct of **DICKINSON ARMS–REO, L.P.** and **INSIGNIA MANAGEMENT GROUP** as the owner and management company for the Dickinson Arms Apartments means that degree of care that would be used by an *owner or occupier of ordinary prudence* under the same or similar circumstances.

. . .

"PROXIMATE CAUSE" means that cause which, in a natural and continuous sequence, produces an event, and with-out which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using **ordinary care** would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event, but if an act or omission of any person not a party to the suit was the "sole proximate cause" of an occurrence, then no act or omission of any other person could have been a proximate cause.

(Emphasis in original.)

### *QUESTION NO. 1*

Was the negligence, if any, of those named below a proximate cause of the occurrence in question?

Answer "Yes" or "No" for each of the following:

| | |
|---|---|
| Dickinson Arms–REO, L.P. | (yes) |
| Insignia Management Group | (yes) |
| Joe Darin Campbell | (no) |

### *QUESTION NO. 2*

What percentage of the negligence that caused the occurrence do you find to be attributable to each of those found by you, in your answer to Question No. 1, to have been negligent?

The percentages you find must total 100 percent. The negligence attributable to a person named below is not necessarily measured by the number of acts or omissions found.

| | |
|---|---|
| Dickinson Arms–REO, L.P. | (25%) |
| Insignia Management Group | (75%) |
| Joe Darin Campbell | (0%) |
| Total | 100% |

■ The jury charge is consistent with settled law. A landlord who retains control over the security and safety of a premises owes a duty to a tenant and the tenant's employees and guests to use ordinary care to protect them against an unreasonable and foreseeable risk of harm from the criminal acts of third parties. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995); *Haight v. Savoy*

*Apartments,* 814 S.W.2d 849, 853 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *see also Taylor v. Gilbert Gertner Enter.,* 466 S.W.2d 337, 341 (Tex.Civ. App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.).

Proximate cause consists of two elements: cause in fact and foreseeability. *Farley v. M M Cattle Co.,* 529 S.W.2d 751, 755 (Tex.1975); *Summers v. Fort Crockett Hotel, Ltd.,* 902 S.W.2d 20, 25 (Tex.App.— Houston [1st Dist.] 1995, writ denied). Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury, which would not otherwise have occurred. *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex. 1995). Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 756 (Tex.1998); *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996).

### The Evidence

Detective S. Burrows, a police officer and the head of the Gang Task Force for the Dickinson Police Department, was lead investigator in the Campbell shooting. She testified that a gang by the name of "The Brown Assassins" was real popular in Dickinson, and that car-jacking is a popular activity with gangs. Jeremy Gartrell had been documented as a Brown Assassins gang member with the Dickinson Police Department, and it was known by the police that Gartrell and Donald Nichols hung around together. During the investigation of the shooting, Detective Burrows learned that Gartrell and Nichols had been at Taco Bell earlier the night of the murder with friends, and that they had talked about a car-jacking. The Taco Bell is across the street from the Dickinson Arms Apartments.

Burrows further testified about the make-up and reputation of the area in which the Dickinson Arms Apartments are located. The city of Dickinson is broken down into sectors such as Northwest one, two, and three, North Central, South Central, Northeast one, two, and three, etc. The Dickinson Arms Apartments are located in sector Northwest three. Prior to June 1994, Burrows did not have any specific knowledge that any gang members lived at the Dickinson Arms Apartments. However, when asked what the reputation of the Northwest three sector was prior to June 1994, as relates to crime or criminal activity, Burrows responded, "[We] had quite a few motor vehicle burglaries, stolen vehicles, lots of vandalism and assault calls." The Northwest three sector covered less than one square mile. Within the sector, on the same side of the freeway as the Dickinson Arms Apartments, was the El Rancho Motel. Burrows had responded to calls at the motel "many, many times." The motel had a bad reputation in June of 1994 because, "Quite a bit of drug activity and prostitutes had been documented by officers. We had some League City officers almost get shot out there [in a gun fight]." Across the freeway from Dickinson Arms, still in the Northwest three sector, were two other apartment complexes that had bad reputations for criminal activity because, "You have a lot of drug activity. We have a lot of family violence, assaults, child abuse, you name it, it occurs over there."

Burrows further testified that the Dickinson Police Department keeps information about calls for service, and if an apartment complex were to ask, it could receive call reports and offense report information. The police department also provides crime surveys upon request, describing the types of crimes that have occurred in a particular area. Additionally, police department personnel are available to go out to an address and give an owner advice on how to make the premises safer.

Through Detective Burrows, evidence came in that the shooter, 16–year–old Jeremy Gartrell, had been expelled from high school two months before the murder. His school records described Gartrell as

truant, insubordinate and violent, often getting into fights and even making terroristic threats. The presence of a police officer on the high school campus did not deter Gartrell from engaging in that type of conduct. Just eleven days before the murder, Gartrell had assaulted another juvenile, and the police were trying to locate him to apprehend him. Friends of Gartrell's had described him as violent, irrational, psycho, disrespectful, and not afraid of the police or authority figures.

LaVaughn Nash, property manager of the 96–unit Dickinson Arms Apartments from March 1994 to January 1995, testified that her company, defendant Insignia Management Group, took over management of Dickinson Arms in March 1994, four months before the murder. Ms. Nash worked in the on-site management office daily from 8 a.m. until after 6 p.m.; she did not live at the apartments. No one told her there were gang members living at the apartments. Although the management company's "Administrative Policy and Procedures Manual" states that management should "check with your local police department for any preventative safety programs they may offer," Nash had never done that. Although a management company report had been produced indicating that Dickinson Arms may need improved lighting, Nash had never been informed of that. Nash had never had a security survey of the apartments done. Although she considered it important to know if there was crime occurring at the apartment complex, she never called the police department to ask them about crime at the apartments. Further, she never talked to anyone at the management company about crime in the complex. Although just five days before Nash became property manager an assault took place at the apartments, Nash was not aware of it.

The policy and procedures manual also provided: "When crimes and/or assaults on residents occur, management should notify the residents of the community and take necessary measures to improve the situation." The Dickinson Arms Apartment leases specifically provided that tenants would be in default, and subject to eviction, if they or their guest violated criminal laws, regardless of whether an arrest occurred. Further, a tenant would be in default if "any occupant is arrested for a felony involving actual or potential physical harm to a person or involving possession, manufacture, or delivery of a controlled substance."

On April 2, 1994, Stacy Hughes and Felicia Rodriguez, two tenants in apartment no. 69 located near the management office, were arrested for aggravated robbery and a gun was recovered; Ms. Nash was unaware of that. Even though there were a multitude of calls from the Dickinson Arms Apartments to the police during the period from January 1, 1991 through June 16, 1994, Nash did not know anything about there being any crime on the property prior to the murder of Campbell, except for one incident: in May 1994, Nash herself reported to the police $200 worth of damage to some flowers on the premises. After the Campbell murder, Nash called the Dickinson Police Department and asked for a police call report; she received a multi-page print-out of calls for service from the apartments.

Nash, having been in the property management business for many years, was aware that she could have called the police department to find out what kinds of crimes had been reported as having occurred at the apartments; she just never made such a call to the police department until after the Campbell murder. From time-to-time, police officers would come to the property, and Nash would talk to them; they never told her they thought she had any problems.

Among the files left by the prior management company was an incident report, dated October 22, 1993, which reads: "Residents fighting, shots fired, window in downstairs apartment shot out." Nash testified she had never been told about the incident. The residents involved in the

incident were no longer living at the apartments when Nash's management company took over.

A Galveston County deputy sheriff, Officer Callender, lived at the apartments and he performed courtesy security services for the apartments, including making routine patrols to check the lighting and grounds. He never told Nash there was a need for more security. The management company did not represent to the tenants that they had security for the apartments—what Officer Callender did was not represented to be security-related. Tenants were told that if there was a problem, they should call the police.

Robert Terrazas, maintenance supervisor at the Dickinson Arms Apartments at the time of the murder of Campbell, testified about the layout of the apartments. Apartment no. 69, where Stacy Hughes and Jesse lived, was on the ground floor and located close to the manager's office. One night before the murder, Terrazas had a confrontation in the pool area with a "thuggy-looking little gangster" who was visiting Stacy Hughes in apartment no. 69. When Terrazas went up to apartment no. 69, Stacy Hughes and he "had words." Terrazas reported the confrontations to the leasing agent the next morning. Terrazas never had any other problems with Stacy Hughes.

During the three years Terrazas worked at Dickinson Arms, he saw representatives of the owners visiting the premises maybe six times. The only crime Terrazas could remember knowing about was an abandoned car someone left at the apartments, the back fence boards being kicked out by juveniles, and the Campbell murder. He never felt unsafe walking the property at night. He agreed that the nearby El Rancho Motel was a bad place, with a reputation for drugs and prostitution. Prior to

the murder, no one ever told him that gang members were living at the apartments.

Kay Bishop, a tenant at the Dickinson Arms Apartments from June 1993 to June 1996, was also a part-time, weekend leasing agent for the complex until March 1994. She testified that there were a lot of complaints about people who did not live at the apartments coming on the apartment premises in the evenings; they would take over the washateria and would also get in the swimming pool area. Bishop considered these strangers to be dangerous to her and her two children. She made these incidents known to the manager, LaVaughn Nash, but as far as she knew Ms. Nash did nothing in response. She could not remember whether she complained to Ms. Nash before, or after, the June 16, 1994 murder of Campbell.

Horace B. Loomis, plaintiffs' security consultant expert, reviewed records from the Dickinson Police Department, and then prepared a summary of the total amount of reported crimes that were committed at the apartments between January 1, 1991 and June 16, 1994. The summary was prepared from documented reports made by the officers who responded to calls for service.[1] The summary[2] showed a total of 184 offenses, as follows:

Incident Reports

| Descriptions | Total |
| --- | --- |
| Disorderly Conduct | 74 |
| Vandalism | 26 |
| Burglary | 20 |
| Vagrancy | 15 |
| Auto Theft | 13 |
| Assaults | 11 |
| Offenses Fam-child | 10 |
| Theft | 8 |
| Other Assaults | 2 |
| Drunkenness | 1 |
| Murder | 1 |
| Narcotic | 1 |

1. The summary did not cover all "calls for service" from apartments, but rather only those that resulted in written incident reports; there are usually two to three times as many "calls for service" as actual reports.

2. The summary was introduced as Plaintiffs' exhibit no. 38. The one murder reflected on the summary was Campbell's murder.

| Descriptions | Total |
|---|---|
| Robbery | 1 |
| Sex Offenses | 1 |

Loomis testified, without objection, as follows:

Number one, in my opinion, based on my experience as a consultant to other apartment complexes, this apartment complex, based on those figures that you see up there, has an elevated crime rate on property. . . . The opinion I had concerning the negligence in this fact, in my opinion the apartment complex owed an obligation or duty, if you wish, of ordinary care to protect the deceased Plaintiff in this case from criminal harm, which they failed to do. And because, in my opinion, he was an invitee or guest on the property and, therefore, was entitled to that type of care, which they failed to do, so, therefore, the apartment complex was negligent in their conduct toward the deceased.

Secondly, the—that which happened to the deceased in this case, in my opinion, was reasonably foreseeable by the Defendants in this matter. In my opinion, they knew or should have known they had a dangerous condition existing on their property. That could be the criminal element on the property.

The fact that they didn't know—didn't know indicates to me they didn't bother to find out from the Dickinson Police Department what was going on on the property, which they could very easily have done.

So, they just didn't care what was going on on the property, and they should have, and had they they would have seen they needed to do something about the security, which is a thorough lack of security on the property. In my opinion, there was not proper security at this location at the time of the incident. If you will notice this apartment complex is a horseshoe drive in here, back here, or out here, or vice versa. No other way to get in or on the property. I am talking about the fact here, and here, there are no access control gates to control traffic on the property. I think that's negligent, in my opinion, for failure to have the gates there so the residents can be protected from outsiders or from criminal harm.

There is nothing more valuable to this apartment complex than the people who live there. The pool's not valuable. The building's not valuable. The most valuable assets are the people who live there because without people living there they have to close and board it up.

So, they have to do what's reasonable and prudent to protect those people from criminal harm, in my opinion.

I am not saying they must take this property and build a moat around it and fill it full of alligators. That's not reasonable and prudent. What I say, they must put gates there, have adequate fencing around the property to protect the residents, which they did not have.

There is testimony time and time again of holes in the fence back here people go through. A lot of people use it for a short cut. Kroger's right here. They probably cut through for their groceries, and back here. That's not good for security.

The third issue is, in my opinion, this property should be patrolled at night by . . . a security guard, and probably one guard would be sufficient.

Access gates is another, and in my opinion had these things been done to protect these residents this event, in all probability, would not have happened. . . .

Q. Okay. Did, in your opinion, did the failure of these apartment complex owners and operators in providing security for this apartment complex we have just discussed, did those failures cause or contribute to this incident which brings us here today?

A. Yes, I have an opinion. It's my opinion that the failure to provide proper security, the failure to properly fore-

see that this could happen was a probable cause for the Plaintiff's demise in this part.

Loomis further testified that, in his opinion, a uniformed guard deters crime at night at apartment complexes. It is not necessary to have multiple murders at an apartment complex to be able to foresee that a serious crime may occur. "As far as me holding the owner responsible, the foreseeability, it's a pattern of crime that develops on the property that indicates to me we're going to have more serious crime and we better have steps, take steps that's reasonable and prudent to provide proper security for the protection of the residents." Loomis testified that when you have a complex with quite a bit of criminal activity on it and you have residents living there, you have a potential for a resident to cross paths with a criminal individual; whenever they cross paths you have a potential for someone to get hurt.

The next witness, Kelly Lynn Scott, was a certified apartment manager who worked for defendant Insignia Management Company from January 1994 through May 1997. She began to manage Dickinson Arms Apartments in September 1994. Scott was not aware of any crime assessment of the Dickinson Arms Apartments being done in March 1994 when Insignia Management took over the apartments; if there had been one, it should have been in the files she received in September 1994.

Scott was a member of the Houston Apartment Association, and she was familiar with the "Red Book," published by the Houston and Texas Apartment Associations. The "Red Book" contains 72 crime prevention ideas for apartments that go beyond normal practice, including the suggestion that new management demand all resident files and security related files at management changeover. Scott agreed that this is a reasonable and prudent thing to do, and that if prior management did not turn over such files, new management could contact the police department to obtain much of the information that should have been in such files. Scott additionally agreed that if a certain complex is recognized as being more vulnerable to criminal activity, it would be reasonable and prudent to employ a security guard.

Crime prevention idea no. 51 in the Red Book says, "Obtain a police department crime prevention survey"; Scott admitted that was a good idea, and something that could be requested by a phone call to the police department. Crime prevention idea no. 52 says, "Periodically obtain police department computer printouts" similar to plaintiffs' exhibit 3 that was a printout of calls for service made to the police department. Scott had not received any such computer printout when she began to manage the Dickinson Arms Apartments.

The next witness was John Rucker, who represented the owner of the Dickinson Arms Apartments, GSSW, Limited Partnership (GSSW). In March 1993, the apartments were foreclosed on, and GSSW assumed ownership and control over the apartments. GSSW was in the business of acquiring apartment complexes and other commercial properties at foreclosure sales, fixing them up, and selling them for a profit. When GSSW purchased Dickinson Arms, it was in a run-down condition. In March 1994, GSSW contracted with defendant Insignia to be the management company for the Dickinson Arms Apartments. The management company was responsible for hiring the manager, the maintenance person, and others. However, as owner, GSSW always exercised control and could overrule the management company. For example, if GSSW decided that a security guard should be hired, one would be hired, and if GSSW decided not to have a security guard hired, one would not be hired even if the management company suggested one was needed.

In June 1994, Insignia was managing about 11 properties for GSSW, some outside of Texas. With regard to security, GSSW would not dictate the criteria for

Insignia to use to determine the need to hire security. Rather, GSSW wanted to know Insignia's recommendations regarding security. The 1994 budget presented to GSSW by Insignia for the management of Dickinson Arms listed the cost for "courtesy patrol" at $2,750 per year. "Zero" was listed for security salaries. GSSW made a net annual profit of $100,-000 to $150,000 a year from the Dickinson Arms complex.

Rucker did not know about the crimes that had taken place at the Dickinson Arms Apartments until after this lawsuit had been filed. He found the number of offenses reflected on plaintiffs' exhibit no. 38 to be surprising. The offices of GSSW were in Dallas, and an owner representative would visit Dickinson Arms between two and four times a year. Whether he expected the management company to inform him about criminal episodes at the complex depended on the seriousness of the crime. If Insignia had told GSSW that there was a rough crowd living at the apartments, that there was loitering, and that the property had a bad reputation, and if based on that Insignia recommended a security firm be hired, GSSW would possibly consider that to be a reasonable recommendation. Insignia never made such a recommendation.

The next witness was Dr. Merlin Moore, a professor of criminal justice at Sam Houston State University, and the senior partner in a consulting firm primarily concerned with premise liability and crime analysis type work. He testified that juvenile offenders like Jeremy Gartrell are basically undeterrable, uncontrollable, and not rehabilitative. The best society can do is to "recognize them as quickly as we can, at an early age, and simply try to get them off the street for the longest period of time." Moore summarized his understanding of what happened the evening of June 15, 1994, which he had gleaned from the police reports and other available information. With regard to Jeremy Gartrell, he said:

[I]t's my understanding that [around midnight] we have got Mr. Gartrell and Mr. Nichols who have kind of been out on the town. They had been drinking pretty much—much of that particular day. And Mr. Gartrell and Mr. Nichols met up with some individuals at the Taco Bell restaurant, which is really not far from the Dickinson Arms Apartments. And there apparently was some conversation about, I think there was—if I remember correct, it was a green Mustang that had come through the Taco Bell restaurant and Gartrell had mentioned something about car jacking that car. And I think Nichols had said, "What are you crazy?" "No, not here." Shortly after that, they went from the Taco Bell restaurant and they apparently had a friend who lived over at the Dickinson Arms Apartments. I think if I remember correctly in the police report that friend's name was Jesse. They went there, in a sense, just to visit, and then as they left there they happen to see this black truck come by and Gartrell apparently mentioned that, "Look. I am going to jack that truck." It's my understanding that Gartrell went up to Mr. Campbell, certainly with the intention to jack that truck, and then it's, you know, it's—what you believe. It's my understanding that, possibly, Mr. Campbell, in a sense, confronted Mr. Gartrell, said whatever he said, but he argued with him, in terms of—or possibly argued with him about not giving him the truck and Gartrell shot him. They then got into the truck and then, of course, sped away—he and Mr. Nichols. I mean, that's generally what I recall, in terms of reading the materials and in terms of the general facts in terms of this case.

Moore explained that he was asked by defendants to determine whether the Dickinson Arms Apartments complex was a reasonably safe environment prior to the time of Campbell's murder in June 1994. In terms of a crime analysis standpoint,

Moore reviewed the Dickinson police department records on calls for service made from the apartments. Plaintiffs' exhibit no. 1 contains 644 pages of records from the Dickinson police department regarding calls for service from the Dickinson Arms Apartments from January 1, 1991 through June 16, 1994. Moore reviewed the exhibit no. 1 documents and differentiated between domestic disputes (crimes between individuals who know each other), and stranger initiated crimes, opining that "In most domestic type crimes, security can't really do too much about that." Moore found that during that period there had been no murders, rapes, robberies, or aggravated assaults. Because of the absence of such violent crimes in the past, it was Moore's opinion that nobody could foresee a murder at the apartments was likely to occur.

As for the 11 assaults that occurred at the apartments during that period, Moore testified they were all simple assaults between people who knew each other; none were stranger initiated assaults where a stranger came on the property and assaulted someone else. The one robbery listed on exhibit no. 38 did not occur at the apartments; rather, it occurred in Santa Fe, Texas, and was simply called in from the apartments. From Moore's review of the records, the 184 incident reports described on exhibit no. 38 did not represent 184 actual crimes committed at the apartments; he believed the true number of crimes committed was about 60, over a 3½ year period. This was an insignificant number of crimes in comparison with many other apartment complexes he had looked at through the years.

From looking at the reports on crime, it was Moore's opinion that the Dickinson Arms was a very low crime area and a reasonably safe place to live before June 16, 1994. It was his feeling that perimeter fencing and limited access gates are not very useful from a security standpoint; they are more of a traffic control device. In his opinion, a security guard would not have stopped an offender like Gartrell. He believed it was reasonable that the apartments did not employ a security guard.

Another thing Moore likes to look at is the spontaneity of the crime committed. Gartrell is a very impulsive, explosive type of individual. As soon as Gartrell saw Campbell's truck, all of a sudden it became a target. That contributed to Moore's opinion that this offense was not foreseeable to defendants. From his review of the records regarding Gartrell, it was Moore's opinion that no type of security methods would have deterred Gartrell from committing the car-jacking and murder—Gartrell was a time bomb just waiting to happen.

On cross examination, Moore agreed that if Gartrell had simply stolen Campbell's truck, the offense would have been reported as a theft. Because Campbell may have tried to stop Gartrell and ended up being shot, the theft escalated into a murder.

Moore reaffirmed that police department "call for service" reports are the first thing he asks for when he determines whether a place is a reasonably safe environment. He also looks at offense reports. He has advised apartment management companies in the past to obtain "calls for service" reports from local police departments in connection with their evaluations of security needs. Also, Moore would like to see more businesses ask the local police department for a crime survey.

With regard to undeterrable juvenile criminals like Gartrell, Moore agreed that "We don't just quit hiring ... security guards to protect people and provide safe environments, we have to keep trying."

The next witness was Ronald Ahlhorn, deputy superintendent in the Dickinson School District and former principal at Dickinson High School from 1990 to 1995. He testified that the school had repeated problems with Gartrell not attending classes during the 1992, 1993, and 1994

school years. Gartrell had been disciplined for fighting or assaulting students at least four different times, and he had threatened students on other occasions. The fact that a police officer was assigned to the campus during the school day was no deterrent to Gartrell; Gartrell was expelled from school in April 1994. Ahlhorn was not surprised when he learned Gartrell had killed someone.

Donald Nichols testified by deposition that he was with Jeremy Gartrell and Gartrell's girlfriend the entire day preceding the shooting of Campbell. They were drinking beer and Gartrell "talked briefly here and there all day long about car-jacking someone just in general." That evening they got a ride to the Kroger's shopping center next to the Dickinson Arms Apartments. Gartrell had a gun loaded with one bullet with him; Nichols had a clip of bullets for the gun. They were on their way to visit Jesse, a member of the Brown Assassins gang who lived at Dickinson Arms; Jesse's roommate was Stacy Hughes. Nichols also knew the Rodriguez brothers who lived upstairs at the Dickinson Arms Apartments; they were members of the LaRaza gang.

From Kroger's parking lot, Nichols and Gartrell went to the Taco Bell located across the street from Kroger's. There were a lot of people at Taco Bell and it was well lit. A green Mustang drove through the parking lot, and Gartrell made a statement about car-jacking the Mustang; Nichols told Gartrell, "No, don't be stupid." They did not car-jack the Mustang.

From Taco Bell, Nichols and Gartrell walked back to the Kroger parking lot, which was well lit. After buying cigarettes at Kroger's, they walked through a field to the fence of the apartments and went through a hole in the fence. Nichols testified, "There was a bunch of holes in the gate. There was holes everywhere. There was holes a bunch of places. There is like a trail that goes through there, a random path that has no grass and stuff, and leads through the back in the corner."

There were 15 to 20 people at Jesse's apartment; it was a Brown Assassin gang get-together. Nichols and Gartrell drank some beer, stayed for less than an hour, and then left. They were planning to go back through a hole in the fence, across the field, and then cross the highway to the Pine Forest apartments to visit a guy who lived there. As they were walking toward the hole, they saw Joe Campbell's truck moving slowly in the apartment parking lot. It was dark, there were no lights, and there was no security guard. Nichols had once lived in the apartment complex next door to the Dickinson Arms, and he had friends that lived in Dickinson Arms; he had never seen a security guard at the complex.

When Gartrell saw Campbell's truck, he said "That's the one. I'm going to jack him." Nichols kept walking toward the fence, while Gartrell ran down to the truck. Gartrell still had the gun with one bullet in it. Nichols heard Gartrell arguing with the truck driver, he heard Gartrell say "Don't rush me," and then he heard the gun fire. Gartrell drove the truck around the corner and yelled for Nichols to get in.

Charlotte Davis, a tenant at the Dickinson Arms Apartments at the time of the murder, testified that she heard a noise and looked out her apartment window. The parking lot was lighted and she saw a dark-colored truck and a body lying on the ground. Someone got in the truck and sped away.

## ANALYSIS

Defendants complain that the evidence is insufficient to support the jury finding of proximate cause against them because plaintiffs failed to prove foreseeability and cause in fact.

### Foreseeability

 "Foreseeability" requires only that the general danger, not the exact sequence of events that produced the

harm, be foreseeable. *Timberwalk*, 972 S.W.2d at 756–58. When the "general danger" is the risk of injury from criminal activity, the evidence must reveal "specific previous crimes on or near the premises" in order to establish foreseeability. *Id.* Proper factors to be considered in determining foreseeability in the context of premises liability for the criminal acts of third parties are: (1) the proximity of other crimes; (2) the recency and frequency of the other crimes; (3) the similarity of the other crimes; and (4) the publicity of the other crimes. *Id.*

■ The foreseeability of an unreasonable risk of criminal conduct is a prerequisite to imposing a duty of care on a person who owns or controls premises to protect others on the property from the risk. *Timberwalk* at 756. Once this prerequisite is met, the parameters of the duty must still be determined. *Id.* "Foreseeability is the beginning, not the end, of the analysis in determining the extent of the duty to protect against criminal acts of third parties." *Id.*

■ Whether an unreasonable risk of harm to an invitee from criminal conduct is foreseeable must be determined from what the premises owner and manager knew or *should have known* before the criminal act occurred. *Timberwalk* at 756.

### 1. Proximity, Recency and Frequency of Other Crimes

■ For a landowner to foresee criminal conduct on property, there must be evidence that other crimes have occurred on the property or in its immediate vicinity. *Timberwalk*, 972 S.W.2d at 757. Foreseeability also depends on how recently and how often criminal conduct has occurred in the past. *Id.* at 757–58. The following evidence is relevant to proximity, recency, and frequency:

— Plaintiffs' exhibit no. 1 contained 644 pages of records from the Dickinson Police Department regarding calls to the police for service; all of the described calls originated from the Dickinson Arms Apartments between January 1, 1991 and June 16, 1994.

— Plaintiffs' exhibit no. 38 is an itemization of 184 crimes that were reported as having been committed at the apartments between January 1, 1991 and June 16, 1994. Exhibit no. 38 was prepared after a review of the 644 pages in exhibit no. 1 and reflects what was reported by police officers in writing after they had responded to calls for service. Not all calls for service reflected in exhibit no. 1 resulted in a written police report; thus there were many more calls for service shown in exhibit no. 1 due to alleged criminal activity than the 184 described in exhibit no. 38. There was evidence that there are usually two to three times as many "calls for service" as compared to actual written police reports.

— Plaintiffs' expert testified that, based on the number of reported crimes reflected in exhibit no. 38, the Dickinson Arms Apartments had an elevated crime rate on the property. Defendants' expert, on the other hand, testified that the Dickinson Arms Apartments was a very low crime area, concluding that out of the 184 offenses listed on exhibit no. 38, only about 60 were true crimes.

— The Dickinson Arms Apartments are located in sector Northwest three in Dickinson, an area of less than one square-mile. Within sector Northwest three are also located the nearby El Rancho Motel and two other apartment complexes, all three of which had bad reputations in June 1994 for criminal activity based on the number of times the police had to respond to calls.

— A gang by the name of the Brown Assassins was real popular in Dickinson. Car-jacking is a popular ac-

tivity with gangs. Jeremy Gartrell, who shot Campbell, had been documented as a Brown Assassins gang member with the Dickinson Police Department. The evidence indicated that immediately before the murder of Campbell, Gartrell had been at a gang meeting in apartment no. 69 where Stacy Hughes and Jesse lived.

— A tenant and part-time leasing agent testified that a lot of people who did not live at the apartments would come onto the premises at night and take over the washateria and the pool area; she considered the strangers to be dangerous to her and her children.

## 2. Similarity of the other crimes

■ The previous crimes must be sufficiently similar to the crime in question as to place the landowner on notice of the specific danger. *Timberwalk*, 972 S.W.2d at 758. However, the prior crimes need not be identical. *Id.* As stated by the Supreme Court in *Timberwalk:*

> A string of assaults and robberies in an apartment complex make the risk of other violent crimes, like murder and rape, foreseeable.... Property crimes may expose a dangerous condition that could facilitate personal crimes, as when apartments are targeted repeatedly by thieves.... An apartment intruder initially intent upon stealing may decide to assault a tenant discovered inside, even if the tenant avoids confrontation.

*Id.* at 758. The following evidence is relevant to similarity of other crimes:

— Out of the 184 crimes described in exhibit no. 38, there are included:

20 burglaries

13 auto thefts

11 assaults

8 thefts

These types of crimes could make the risk of other violent crimes, such as murder, foreseeable if there would be a confrontation.

— Plaintiffs' expert testified that when you have a complex with quite a bit of criminal activity on it, you have a potential for a resident to cross paths with a criminal individual, and whenever they cross paths there is a potential for someone to get hurt. In his opinion, due to the dangerous environment caused by the criminal element at the apartments, the risk of serious injury or death was foreseeable.

— Defendants' expert testified that, because there had been no reported murders, rapes, robberies, or aggravated assaults in the past, nobody could foresee a murder at the apartments was likely to occur. He also testified that the 11 assaults listed on exhibit no. 38 were assaults between persons who knew each other, rather than stranger-initiated assaults, and thus they would not lead anyone to think there was an unreasonable risk of a stranger-initiated assault being likely to occur.

— Prior to June 1994, the Northwest three sector of Dickinson had been the source of many calls to the police department regarding motor vehicle burglaries, stolen vehicles, vandalism, and assaults. The near-by El Rancho motel had a bad reputation due to drug activity, prostitution, and a gun fight that almost wounded some police officers. Two other apartment complexes in the Northwest sector also had bad reputations for crime because of drug activity, assaults, family violence; "You name it, it occurs over there," according to Detective Burrows.

— The murder of Campbell was committed by a known member of the Brown Assassins gang. Car-jacking is a popular activity with gangs in Dickinson and can clearly escalate into aggravated assault or murder. There was evidence Gartrell attended a

Brown Assassins gang meeting at apartment no. 69 at the Dickinson Arms Apartments just prior to the car-jacking and murder of Campbell.

### 3. Publicity of other crimes

▮ Previous similar criminal incidents cannot make future crime foreseeable if nobody knows or should have known that those incidents occurred. *Timberwalk*, 972 S.W.2d at 759. If a landlord has actual knowledge of previous crimes occurring on the premises (as when a tenant reports crime to the landlord), or if the occurrence of criminal activity is widely publicized (as through the media), then the claim that future crime was foreseeable is strengthened. *Id.* at 758–59. However, those are only two ways by which a landlord can reasonably be expected to learn about such crimes.[3] Although property owners bear no duty to "regularly inspect" criminal records to determine the risk of crime, *id.* at 759, there may be a duty to make some inquiries under certain circumstances. The following evidence is relevant to the issue of whether defendants *should have known* about the prior incidents of crime at the apartments and in the surrounding nearby area:

— Defendant GSSW was in the business of acquiring distressed apartment complexes at foreclosure sales, fixing them up, operating them for a short period, and then selling them for a profit. When GSSW purchased the Dickinson Arms Apartments, they were run-down. GSSW hired defendant Insignia to be the management company. Insignia did not receive any files regarding crime at the complex from the prior management company, and Insignia did not have a crime assessment performed. The on-site property manager testified she did not know anything about

there being any crime at the complex until the murder of Campbell, with the exception of a report she personally made to the police regarding $200 worth of damage to some flowers. She further testified that, having been in the property management business for years, she was aware that she could have simply called the local police department to find out what kind of crimes had been reported as having occurred at the complex; she just never made such a call until after the Campbell murder.

— Defendants' own security expert testified that, when determining whether a place is a reasonably safe environment, the first thing he asks for is the police department's "calls for service" reports for the address involved. He also looks at offense reports. He has specifically advised apartment management companies to obtain "calls for service" reports from local police departments in connection with their evaluations of security needs.

— Defendant Insignia's own employee testified it would be reasonable and prudent for a new management company to demand all resident and security-related files from the old management company, and if prior management did not turn over such files, new management could contact the local police department to obtain much of the information that should have been in such files. Insignia's employee further testified she was familiar with the recommendations in the "Red Book" published by the Houston and Texas Apartment Associations regarding crime prevention at apartments, and she agreed they were good

---

**3.** As noted in the recent *Mellon* case by Justice O'Neill, in her dissenting opinion joined by Chief Justice Phillips and Justice Hankinson, "[T]here is nothing to suggest that [the articulated *Timberwalk* [actors] are meant to be exclusive." *Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654 (1999) (O'Neill, J., dissenting).

ideas. The Red Book recommended that apartments obtain a police department crime survey, and further that they obtain a print out of "calls for service" from the local police department; defendants had done neither.

— A Dickinson police officer testified about how easy it is for an apartment complex to obtain "calls for service" reports, offense reports, crime surveys, and advice on how to make the complex safer.

Applying the *Timberwalk* factors—those that must be considered together in determining whether criminal conduct was foreseeable—to the facts before us, we conclude that the evidence is legally and factually sufficient to support the jury's finding that an unreasonable risk of violent criminal conduct at the apartments was foreseeable. It was up to the jury to weigh the evidence and judge the credibility of the witnesses; this Court cannot substitute its opinion for that of the trier of fact. *Neese v. Dietz,* 845 S.W.2d 311, 313–14 (Tex.App.—Houston [1st Dist.] 1992, writ denied).

### Cause In Fact

 Defendants next complain that the evidence is legally and factually insufficient to support the cause in fact aspect of proximate cause. Cause in fact means the negligent act or omission was a substantial factor in bringing about the injury, and without which no injury would have occurred. *Nixon v. Mr. Property Mgmt. Co., Inc.,* 690 S.W.2d 546, 549 (Tex.1985).

Defendants argue that the shooter, Jeremy Gartrell, was an unstoppable and undeterrable individual whose conduct had no relation to defendant's alleged negligence. Defendants assert that the carjacking and shooting would have taken place even if defendants had used all reasonable care.

Defendants rely heavily on the testimony of their expert witness who testified that a security guard, perimeter fencing, and limited access gates would not have stopped an offender like Gartrell, who was an impulsive, explosive type individual—a time bomb just waiting to happen. Defendants also rely on the testimony of the former high school principal and Gartrell's peers regarding his violent nature, lack of respect for authority, and undeterrability.

Plaintiffs counter that the evidence shows Gartrell had wanted to do a carjacking throughout much of the day and had ample opportunities to do so, but he was deterred by the surroundings. For example, before going to the Dickinson Arms Apartments, Gartrell and Nichols were at the nearby Taco Bell and Gartrell told Nichols he was going to car-jack a green Mustang that had pulled up. There were people present and Taco Bell was well lit; Nichols said something like "Don't be stupid." Gartrell did not car-jack the green Mustang. Then Gartrell and Nichols walked to the next-door parking lot of Kroger's on the way to the apartments; the parking lot presented the opportunity to car-jack someone, but it was well-lit and Gartrell did not do so. Though he had spoken of car-jacking someone most of the day, it was not until Gartrell came to the Dickinson Arms Apartments—a place Nichols testified was dark and where they knew there was no security guard or access control gates—that he actually did a car-jacking. The evidence was conflicting regarding lighting in the parking lot the night of Campbell's murder: Charlotte Davis testified the lighting in the parking lot was good enough for her to see Campbell's body and truck from her apartment window; Nichols specifically testified it was dark in the parking lot that night and that there were no lights working in that area.

Plaintiffs' expert witness testified that if defendants had access control gates, a night security guard, and perimeter fencing, this offense, in all probability, would not have happened.

Mindful that it is the role of the jury to resolve conflicts in the evidence, we conclude the evidence is legally and factually sufficient to support the jury's cause in fact determination.

We overrule defendants' issue number two.

We affirm the judgment.

Justice NUCHIA dissenting.

En banc consideration was requested.

A majority of the justices of the Court voted to overrule the request for en banc consideration.

Chief Justice SCHNEIDER and Justice TAFT dissent from the overruling of the request for en banc consideration and would join the dissenting opinion of Justice NUCHIA.

SAM NUCHIA, Justice, dissenting.

I respectfully dissent.

Generally, a person has no legal duty to protect another from the criminal acts of a third person. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995); *Haight v. Savoy Apartments,* 814 S.W.2d 849, 853 (Tex.App.—Houston [1st Dist] 1991, writ denied). There is an exception to this rule when criminal conduct is a foreseeable result of a party's negligence. *Id.* A landlord who retains control over the premises has a reasonable duty of care to keep the premises safe for tenants and their guests. *Taylor v. Gilbert Gertner Enter.,* 466 S.W.2d 337, 341 (Tex.Civ. App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.).

Proximate cause consists of two elements: cause in fact and foreseeability. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992); *Summers v. Fort Crockett Hotel, Ltd.,* 902 S.W.2d 20, 25 (Tex.App.— Houston [1st Dist.] 1995, writ denied). Both of these elements must be present to establish proximate cause. *Farley,* 529 S.W.2d at 755; *Summers,* 902 S.W.2d at 25. Cause in fact means that the defen-

dant's act or omission was a substantial factor in bringing about the injury, which would not otherwise have occurred. *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995). Foreseeability requires that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996).

In the recent case of *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749 (Tex.1998), the supreme court clarified the factors to be considered by a court of appeals in determining foreseeability in the context of premises liability for the criminal acts of third parties:

[C]ourts should consider whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them.

*Id.* at 757.

The court calls these factors proximity, recency, frequency, similarity, and publicity. *Id.* at 759. The evidence must show that other crimes have occurred on the property or in the immediate vicinity. *Id.* at 757. The previous crimes must be sufficiently similar to the crime in question to place the defendant on notice of the specific danger. *Id.* at 758. Crimes such as domestic violence and vandalism of automobiles do not make violent crimes such as sexual assault foreseeable. *Id.* Publicity surrounding the previous crimes or actual knowledge of the crimes may indicate foreseeability. *Id.*

Appellees claim that the degree and nature of the crime on the premises and in the surrounding area, the appellants' failure to request police department records to determine the amount of crime at the complex and in the vicinity, the inadequate fencing and lighting, and the presence of gang members and other undesirable indi-

viduals in the complex made the crime that resulted in the death of Campbell foreseeable.

To determine that Campbell's murder was foreseeable, we must conclude that: (1) there were enough actual incidents of crime on the property, and they were sufficiently similar in nature to Campbell's murder to establish that appellants knew or should have known that such a murder was likely to happen; or (2) there was publicity of crimes occurring in the vicinity of the apartments that were sufficient in number and similarity to Campbell's murder to establish that appellants knew or should have known that such a murder was likely to happen on their property. If neither of these is established, then the evidence is not legally sufficient to show that a crime like Campbell's murder was foreseeable.

Appellees' expert witness, Horace Loomis, testified regarding the occurrence of crime at the property based upon his review and summary of the Dickinson Police Department's records of calls to Dickinson Arms Apartments from January 1, 1991 to June 16, 1994. These call records were introduced as Plaintiffs' Exhibit 1. In his testimony, Loomis summarized these records for the jury as follows: 74 disorderly conduct calls, 26 vandalism calls, 20 calls for burglary of apartments, 15 vagrancy calls, 17 calls for auto theft, 11 assault calls, 10 parent-child dispute calls, eight theft calls (either from an apartment or automobile), and two "other" assault calls, which, he said, could include aggravated assault. A chart showing Loomis's summary (Plaintiffs' Exhibit 38) also showed an aggravated robbery. Loomis admitted that the aggravated robbery was included because the arrest warrant was served at Dickinson Arms, although the crime was actually committed in Santa Fe, Texas.

Loomis was not able to say whether any of the listed assaults were stranger-initiated as opposed to domestic violence or fights between roommates. He said the

disorderly conduct charges were misdemeanors and could have involved kids.

Loomis did not know of any rapes or murders (other than the incident that is the basis of this lawsuit) that occurred at the apartment complex. He was not aware of any aggravated assaults that occurred at the apartments before June 16, 1994 and was not aware of a single stranger-initiated crime at Dickinson Arms in the last three and one-half years.

The majority makes much of the "644 pages of records from the Dickinson Police Department regarding calls to the police for service" while failing to take into account that this was only a record of calls, not a record of actual crimes which occurred. Appellees in their brief direct us to Plaintiffs' Exhibit 1 and cite only five specific examples as evidence of crime at the complex: three assaults, a gunfight, and the arrest of Stacy Hughes for aggravated robbery. The record shows that two of the assaults are recorded as incidents of domestic violence that occurred on June 24, 1992 and December 19, 1993. The third assault was a complaint dated March 14, 1994 that resulted in a citation warning with no report filed by the investigating officer. The "gunfight" was a fight between roommates on October 22, 1993, in which shots were fired. The residents were evicted. Stacy Hughes was arrested on the premises on April 2, 1994 on a warrant for an aggravated robbery that occurred in Santa Fe, Texas.

The five occurrences cited in appellees' brief are not in any way similar to the stranger on stranger violent crime that resulted in the death of Darin Campbell and are no evidence tending to show that the car-jacking and death of Campbell were foreseeable.

Appellees also refer to three incidents in Plaintiffs' Exhibit 1 as showing suspected drug activity at the complex. However, none of these incidents resulted in an arrest, and the information in the record does not make it clear that any crime was

committed. Even if clearly established, incidents of suspected drug activity do not show foreseeability of violent stranger-on-stranger criminal activity.

Appellees point to the following facts as indications that the complex had a gang problem: there was a gang related party in apartment 69 on the night of the murder; resident Kay Bishop's testimony concerning nonresidents she observed on the property who made her uncomfortable; and Robert Terrazas's description of Stacey Hughes's guest as "a little gangster" and "thuggy." Appellees argue that this indicates foreseeability of violent stranger-on-stranger crime because Detective Burrows testified that car jackings are a crime favored by gangs. However, appellees point to no crimes committed on the property by gang members, violent or otherwise, prior to the murder. Further, Detective Burrows, who identified herself as the lead gang investigator for the Dickinson Police Department, testified that she did not know that gang members lived in the complex and that there was no gang graffiti on the property.

There is no evidence of probative force regarding violent, stranger-initiated crimes on the premises of Dickinson Arms.

Loomis offered no testimony regarding crime in the immediate vicinity of Dickinson Arms. Detective Burrows testified that the El Rancho Motel has a bad reputation for drug activity and prostitution. She does not state in her testimony how far the motel is from Dickinson Arms, although in general she was testifying about an area that is about one mile square.

Detective Burrows also testified that three apartment complexes on the other side of I–45 from Dickinson Arms have a bad reputation for drug activity, family violence, assaults, and child abuse. She did not testify regarding the reputation of Dickinson Arms Apartments.

It is questionable whether Detective Burrows' testimony was any evidence of sufficiently similar criminal activity in the immediate vicinity of Dickinson Arms. However, as noted in *Timberwalk*, "Property owners bear no duty to regularly inspect criminal records to determine the risk of crime in the area. On the other hand, when the occurrence of criminal activity is widely publicized, a landlord can be expected to have knowledge of such crimes." *Id.* at 759.

In considering the factor of publicity, we use the term in its broadest sense to encompass the public media and private dissemination of information. A review of the record reveals a complete absence of any evidence regarding any public dissemination of information about sufficiently similar criminal activity at or near the apartments. In fact, there is no evidence in the record regarding public dissemination of information about any crimes at or near the apartments. In addition, there is no evidence to show actual knowledge or that Dickinson Arms should have known of any sufficiently similar criminal activity near the premises.[1]

## CONCLUSION

Applying a *Timberwalk* analysis to a legal sufficiency standard of review, I would find that there is no evidence regarding sufficiently similar criminal activity on the premises of Dickinson Arms, nor is there any evidence of publicity, either public or private, or of actual knowledge of any similar crimes in the area.

Considering these factors together, as we must under *Timberwalk*, I conclude that there is no evidence of probative force to support the jury's finding of proximate cause, because there is no evidence of foreseeability.

1. The majority implies that *Timberwalk* holds that "there may be a duty to make some inquires under certain circumstances." That is clearly contrary to *Timberwalk's* stated holding that property owners bear no duty to "regularly inspect" criminal records to determine the risk of crime in the area. *Id.* at 759.

I would sustain appellants' second issue and reverse the judgment of the trial court and render judgment that appellees take nothing against appellants.