DEL LAGO PARTNERS, INC. and Del Lago Partners, L.P. Doing Business Under the Assumed Name Del Lago Golf Resort & Conference Center and BMC—The Benchmark Management Company, Appellants,

v.

Bradley SMITH, Appellees.

No. 10–04–00252–CV.

Court of Appeals of Texas, Waco.

Oct. 11, 2006.

Audrey Mullert Vicknair, Law Office of
Audrey Mullert Vicknair, Corpus Christi,

Lansford O. Ireson Jr., Ireson & Weizel PC, Houston, for appellants.

David Dies, Dies & Hart LLP, Orange, for appellees.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

Bradley Smith was severely injured in a bar fight at Del Lago, a resort.[1] He brought a premises liability action against Del Lago, and a jury found the resort 51% responsible and Smith 49% responsible for the occurrence. The jury found actual damages in the amount of $2,874,000, and the trial court, after reducing the damages amount by 49% and then adding prejudgment interest, entered judgment for Smith in the amount of $1,478,283. Del Lago appeals. We will affirm.

## Background

Del Lago, a 300–acre resort on the shores of Lake Conroe, consists of a conference center, a separate 21–story tower with 310 hotel rooms, and 58 golf course cottages. Permanent residences, a marina, a beach area, and a golf course are also on site. The conference center holds the central lobby, banquet rooms, a gift shop, and the Grandstand Bar. The bar seats 208 persons inside and 200 on the outside deck.

Del Lago's security force included two off-duty, experienced law enforcement officers, John Chancellor (Chief of the Shenandoah Police Department) and Lanny Moriarty (a lieutenant with the Montgomery County Sheriff's Department). As of June 2001, Chancellor had been working at Del Lago for six years, and Moriarty had been working there for eight years. Ruben Sanchez, a retired 20–year fireman and paramedic, became a Del Lago loss-prevention officer in 2000, and at the time of trial, he was Del Lago's Director of Security and Safety. Del Lago's security force maintained order and security throughout the resort. Rather than staying in one place, Chancellor and Moriarty would patrol the entire resort together (to "make a presence" and for officer safety) using a golf cart but would split up to walk through the conference center.

Smith, a 29–year–old project manager for Deloitte Consulting, attended a weekend Sigma Chi fraternity 40th reunion at Del Lago from Friday to Sunday, June 8–10, 2001. On Friday night, Smith and his fraternity brothers attended a Sigma Chi event in the bar. Smith estimated that his group was in the bar for three hours; they stayed until it closed. Smith and Spencer Forsythe, a fraternity brother, testified that a uniformed security officer was on duty in the bar "for hours" that evening. The officer even ejected an intoxicated fraternity brother who had become loud and unruly, and he made everyone leave at midnight, even though usual closing time was 1:00 a.m.

On Saturday evening, Sigma Chi had a reception and dinner in a Del Lago banquet room just across from the bar; 228 persons attended. Around 9:00 p.m., Smith and a group of fraternity brothers left the banquet room and went to the bar, which was described as "packed" and "standing room only" at that time. The bar staff was very busy. Forsythe estimated the crowd was 150 to 200 people, about double what it had been the night before.

1. We refer to Appellants Del Lago Partners, Inc. and Del Lago Partners, L.P. d/b/a Del Lago Golf Resort & Conference Center, and BMC—The Benchmark Management Co. collectively as Del Lago.

Around midnight, about fifteen to twenty persons from a wedding party made a loud, noticeable entrance into the bar. Smith and about forty fraternity brothers were still there. A fraternity brother "hit on" a female companion of a wedding party member, and a verbal altercation ensued between the two men. Smith said that the men were standing very close to each other, angrily yelling and pointing for three to five minutes. Elizabeth Sweet, a bar waitress working that night (but not employed by Del Lago at the time of trial), remembered talking with another waitress about the men's exchanges as a funny or harmless situation between intoxicated men; they joked that the men "were drunk and, you know, being just stupid, drunken men."

Forsythe said that verbal exchanges continued in the bar for an hour. He characterized them as "cussing, name-calling, verbal threats, and hand gestures"; the tension was obvious and everyone could tell that a serious problem was brewing. Fraternity brother Toby Morgan also said that tension was in the air and was growing. Fraternity brother Cesar Lopez testified that the conflict between the two groups could be seen for an hour and a half, "and if you didn't see it, you were either blind, deaf, or didn't care." Fraternity brother Michael Brooks, who had experience working in bars, said that the bar staff should have seen and heard the problems and should have called security based on the atmosphere. Forsythe was concerned that the problems would develop into a fight; Morgan was also concerned. Brooks said the ongoing heckling was such that a fight would likely happen and he wasn't surprised when the fight broke out.

Del Lago's procedures called for "zero tolerance" toward violent acts and threats of violence. Sweet agreed that the verbal confrontations between the two intoxicated groups were "heated" and continued "off and on" for an hour and a half.[2] Sweet did not report the situation to the bartender or a manager; she said she did not see a need to call security. She had not received any training at Del Lago on how and when to contact security or how to handle intoxicated patrons, abusive patrons, fighting patrons, or an unruly crowd. The bar manager was not there; Sweet said he had left early that night. No Del Lago employee intervened to defuse the situation. On the other hand, Arlene Duncan, a bartender on duty that night, testified there had been no confrontations and she had not witnessed any heated or threatening arguments. She also said that several "regulars" were in the bar that night and none had commented about seeing threatening conduct.

Witnesses testified that the verbal confrontations turned into physical shoving

**2.** Smith's opening brief referred to Sweet's testimony about the "heated" conflict with citations to the reporter's record (Vol.4, pp. 10–11). In its reply brief, Del Lago asserted that Smith "repeatedly misstates Sweet's testimony—she never said the exchanges between the men were 'heated.'" In his reply brief, Smith quoted Sweet's testimony to note that Del Lago was the party misstating Sweet's testimony:

Q How long did those confrontations go on?
A An hour and a half, probably.
. . .
Q Okay. Was it heated?

A Yes, sir. Well—yes. It was heated. It was—but it was words.
Q Okay. Heated words?
A Yes, sir.
Q Did it go on over a period of an hour and a half?
A Off and on. I was working all night long, so, I mean, I was in and out through the bar. I mean, seeing different people. But when I would walk by people who where in heated—you know, throwing words back and forth to each other—it—it went on throughout the night.

and pushing altercations, including: (1) a loud confrontation and pushing incident that occurred in plain view of the bartender, about an hour before the big fight; (2) members of each group "squaring up"; (3) a wedding party member who was pushing fraternity brothers from behind with his arm "cocked back" and was pulled away by his group; and (4) a 45–second "shoving match" or "push fight" (as described by Morgan and occurring ten to twenty minutes before the big fight) that was between four men, that others in the bar saw and paid attention to, and that was in the bartender's view.

Around 1:30 a.m., serving had stopped, the wait staff was picking up drinks, and the patrons were told it was closing time and they had to leave the bar. But because no one was leaving, the staff had to work their way from the back of the bar, moving table to table and asking the patrons to leave their drinks and to continue their conversations in the lobby or on the bar deck. In spite of the difficulty getting the crowd to leave, the bar staff did not notify security that the bar was closing or of this difficulty. As the remaining bar patrons—including the fraternity group and the wedding party—were being "herded" out of the bar, another verbal confrontation erupted between a fraternity brother and a wedding party member at the bar's double door. The two sides "bunched up" against each other, with shoving, jabbing, and arguing going back and forth. Forsythe noticed that several of his friends were involved, so he moved toward the two groups, which totaled about forty persons, to see what was going on. Punches were suddenly thrown between the two groups, and Forsythe was pushed against a wall and shoved to the floor. Smith, who had not been involved in any of the earlier verbal and physical confrontations, saw Forsythe being kicked and entered the melee to pick up For-

sythe, whom Smith knew to have heart disease and to be in poor health. Smith was hit on the back and on the head as he entered into the fighting groups, and as he and Forsythe were moving out with the flow of people, someone put Smith in a headlock. Smith and his assailant went across the floor with their and the crowd's momentum, and Smith's face hit the wall.

When she saw punches being thrown, waitress Sweet tried to call security but no number was posted, so she called the front desk and was told to call security herself. After getting the number, she turned the task over to a bartender. Sweet said that Duncan, the bartender, tried to stop the fight by yelling at the men to leave, and other bartenders and waitresses also tried to stop it. The fight continued out in the hall, but when a woman caught up in the fight slipped and fell, it ended. There were varying estimates of how long the fight lasted: Forsythe said three to five minutes; Morgan said a minute and a half to two minutes; Lopez said five or six minutes; and Duncan said no more than ten seconds. Sweet said it was not a quick fight.

Del Lago security logged a fight-in-progress dispatch at 1:24 a.m. Sanchez said that he arrived on the scene within fifteen to twenty seconds of the dispatch, but the fighting was over when he got there and most of those involved had fled. Sanchez had been patrolling the hallway behind the conference center when he got a radio call from the dispatcher. Chancellor and Moriarty, who were at the cottages on routine patrol—they had not been dispatched to the cottage area—arrived within two to three minutes of the dispatch. No one wanted to report what had happened or to give their names, but Smith did tell Sanchez, whom he knew personally, there had been a fight. Smith and his

friends left the conference center and went to their respective rooms.[3]

On the night in question, Chancellor and Moriarty were on duty as security in their law enforcement uniforms, and Sanchez was on duty as the loss-prevention and security officer. Chancellor had determined that, based on Del Lago's activity that weekend, only two security officers were needed. Unlike the night before, no security officer was stationed in the bar,[4] but they all said they routinely patrolled it. Del Lago had no policy requiring a security officer be stationed in the bar, no matter how large the crowd, nor was there a policy that a security officer be present at the bar's closing time. Moriarty usually walked through the bar four or five times a night during his shift, but he could not remember how many times or at what times he went through the bar that night. Chancellor said he routinely makes five to eight rounds through the bar when he is on duty, but he could not recall how many times he went through that night. Sanchez walked through several times, but he too could not remember at what times. Chancellor and Moriarty neither saw nor were made aware of any verbal or physical confrontations in the bar, and the bar staff had not called security to report any problems. Moriarty said there is a "crow's nest"—a loft above the bar—that the officers used to observe the bar without patrons knowing they are being watched.

Smith, Lopez, and Morgan said they saw no uniformed officers or Del Lago security personnel in the bar that night at all. Forsythe said he saw no security during the hour or so of confrontations before the fight. Sweet saw security coming through the bar periodically that night, but not during the hour and a half of verbal confrontations; she admitted that security could have come through in that time frame and she maybe did not see them because she was busy working. She said that if security had come through the bar during the verbal confrontations, they should have been able to notice the problem.

## Issues

Asserting nine issues, Del Lago contends that the trial court erred in denying its motion for directed verdict, motion for JNOV, and motion for new trial. Issues one, two, and three assert that Del Lago owed no duty to Smith. In issue four, Del Lago claims that the evidence is legally or factually insufficient to support the finding that Del Lago breached the alleged duty.

Issues five and six allege that there is no evidence of proximate cause. The seventh issue asserts that the evidence is legally and factually insufficient to support the jury's negligence finding and the jury's 51%/49% apportionment of responsibility.

3. Around 4:00 a.m., Smith called Del Lago security and reported a head injury; he was bleeding down his throat and when he blew his nose, his forehead expanded like a balloon. Sanchez and the manager on duty went to Smith's cottage. They offered to call an ambulance, but they testified Smith refused. Smith said he signed a medical refusal form because Sanchez told him he would be all right. After going to work on Monday, June 11, Smith saw a doctor and ultimately had two surgeries to repair face and head injuries. His injuries included: a depressed frontal sinus fracture requiring surgical re-

pair; a cerebral spinal leak requiring repair; atrophy of the temporalis muscle requiring surgical repair and residual disfigurement; a severe deceleration injury to the frontal lobe and subsequent brain atrophy, resulting in permanent brain damage; and psychological disorders from the traumatic brain injury.

4. Chancellor explained that a security guard may have been paid by a private party to be in the bar on Friday night, or a Del Lago officer stationed himself in the bar, rather than patrolling in a golf cart during heavy rain.

Issue eight alleges charge error. Del Lago's ninth issue asserts globally that, as to the previous eight issues, the trial court erred in denying Del Lago's motions for directed verdict, for JNOV, and for new trial.

### Duty

 To prevail on a negligence cause of action, a plaintiff must establish the existence of a duty, a breach of that duty, and damages proximately caused by the breach. *Western Investments, Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex.2005) (citing *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995)). Premises liability is a special form of negligence where the duty owed to the plaintiff depends upon the status of the plaintiff at the time the incident occurred. *Urena*, 162 S.W.3d at 547. In the case of an invitee, the premises liability inquiry focuses on whether the defendant proximately caused the plaintiff's injuries by failing to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition that it knew about or should have known about. *Id.* (citing *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex.1998)). A person generally has no legal duty to protect another from the criminal act of a third person. *Timberwalk*, 972 S.W.2d at 756. But one who controls the security and safety of the premises has a duty to use ordinary care to protect an invitee from a third person's criminal act if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee. *Id.* This duty developed out of the premise that the party with the "power of control or expulsion" is in the best position to protect against the harm. *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex.1993).

 Del Lago's first three issues assert that it owed Smith no duty. Whether a duty exists is a question of law. *Timberwalk*, 972 S.W.2d at 756.

 Foreseeability requires only that the general danger be foreseeable, not the exact sequence of events that produced the harm. *Id.* When the general danger is the risk of injury from criminal activity, the evidence must reveal specific previous crimes on or near the premises to establish foreseeability. *Id.* A duty exists only when the risk of criminal conduct is so great that it is both unreasonable and foreseeable. *Id.* Whether the risk was foreseeable must not be determined in hindsight, but in light of what the premises owner knew or should have known before the criminal act occurred. *Id.* at 757. Factors to be considered in determining foreseeability of the occurrence of certain criminal conduct are: (1) whether any criminal conduct previously occurred on or near the property; (2) how recently the criminal conduct occurred; (3) how often criminal conduct occurred; (4) how similar the conduct was to the conduct on the property; and (5) what publicity was given to the occurrences to indicate that the premises owner knew or should have known about them. *Id.*

 For a premises owner to foresee criminal conduct on property, there must be evidence that other crimes have occurred on the property or in its immediate vicinity. *Id.* Foreseeability also depends on how recently and how often criminal conduct has occurred in the past. *Id.* at 757–58. The occurrence of a significant number of crimes within a short time period strengthens the claim that the particular crime at issue was foreseeable. *Id.* at 758. On the other hand, the complete absence of previous crimes, or the occurrence of a few crimes over an extended time period, negates foreseeability. *Id.*

The previous crimes must be sufficiently similar to the crime in question as to place the premises owner on notice of the specific danger, but they need not be identical. *Id.* The publicity surrounding the previous crimes helps determine whether a premises owner knew or should have known of a foreseeable danger. *Id.* Actual knowledge or notice of past incidents strengthens the claim that future crime was foreseeable. *Id.* But unreported criminal activity on the premises is no evidence of foreseeability. *Id.* at 758–59.

The *Timberwalk* factors—proximity, recency, frequency, similarity, and publicity—must be considered together in determining whether criminal conduct was foreseeable. *Id.* at 759. General foreseeability principles also apply to limit the scope of a premises owner's duty in a particular case. *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 655, 659 (Tex.1999) (applying proximate cause's foreseeability standard to duty analysis); *accord Garcia v. Fifth Club, Inc.*, 2005 WL 240425, at *4 (Tex.App.-Austin Feb. 3, 2005, pet. denied) (mem.op.). Stated broadly, we determine both the foreseeability of the general danger and the foreseeability that the injured party—or one similarly situated—would be harmed by that danger. *Mellon*, 5 S.W.3d at 655.

We now review the evidence presented in light of the *Timberwalk* factors to determine whether Del Lago owed Smith a legal duty to protect him from third-party criminal acts on its property.

*The Evidence*

Smith, through his security expert Gerald Brandt, tendered evidence of the following fourteen documented alleged assaultive crimes at Del Lago for the three and one-half years before the fight in question:

- January 1, 1999: Assault at the cottages where the 18–year–old suspect was highly intoxicated at a New Year's Eve party; a fight took place between two young women. Report prepared by Montgomery County Sheriff's Department.

- August 29, 1999: Assault at the bar; a highly intoxicated patron became belligerent and combative, starting fights with other patrons and ultimately assaulting a police officer around midnight. Duncan, the bartender, allegedly refused to cooperate, indicating she did not want to be involved. Report prepared by Montgomery County Sheriff's Department.

- July 23, 2000: Assault just outside the bar at 2:15 a.m. involving a husband and wife, with alcohol a factor. Officer Moriarty was involved in the investigation. Report prepared by Montgomery County Sheriff's Department.

- June 26, 1999: Sexual assault at Del Lago at 3:00 a.m. Report prepared by Montgomery County Sheriff's Department.

- November 4, 2000: Sexual assault at Del Lago at 2:00 a.m. Report prepared by Montgomery County Sheriff's Department.

- July 5, 1999: Sexual assault involving a highly intoxicated victim who had been seen by Officer Moriarty in front of the conference center in the hours before the rape. Report prepared by Montgomery County Sheriff's Department.

- July 5, 1999: Sexual assault. Alcohol apparently involved; empty bottles of beer and whisky were found at the crime scene. Report prepared by Montgomery County Sheriff's Department.

- November 16, 1997: Assault against a woman by a man near the restroom

just outside the bar. The woman had struck the man twice in the face in the bar around 1:45 a.m. The participants were described as obnoxious and aggressive. Officer Moriarty handled the incident, and a Del Lago incident report was prepared.

- September 20, 1998: Fight involving a large group of hostile men near the rear door of the bar. Officer Moriarty handled the incident, and a Del Lago incident report was prepared.
- August 13, 2000: Two separate assault incidents behind the tower. When the security officer first arrived, a verbal confrontation between eight to ten people was ongoing. Officer Chancellor initially sent the participants to their rooms at 2:30 a.m. but was called out again at 3:20 a.m. because the fight was continuing. A Del Lago incident report was prepared.
- October 26, 2000: Fight in the bar between two patrons; one man was intoxicated and unruly, and the officer recommended he be barred from the bar. A Del Lago incident report was prepared.
- May 20, 2001: Two separate assault incidents on the golf course in the early afternoon. Del Lago's officers were called to the scene; they were called back fifty minutes later when

the fight started again. A Del Lago incident report was prepared.

 Brandt testified that these incidents made the bar fight in which Smith was injured foreseeable. We agree, yet Smith points to more evidence on the duty issue. In addition to the above reported and documented criminal activity, Smith elicited evidence of numerous occasions of undocumented criminal activity that Del Lago had actual notice of.[5] Despite Del Lago's requirement that all incidents be reported in an incident report, Officer Chancellor admitted it was obvious that reports are not prepared for all incidents at Del Lago. While at one point he said he was not aware of unreported violent crime at Del Lago, Chancellor agreed that there had been numerous altercations at Del Lago before Smith's injury; he said he had gone to the bar more than twenty-five times and to the cottages and the tower approximately twenty-five times for verbal and physical confrontations (arguments and fights) between guests in his six years at Del Lago. Chancellor had never witnessed a fight in the bar, but he agreed that his presence in uniform with a badge and a gun tended to deter people from fighting. Sanchez acknowledged that Del Lago had had other fights and problems and that he had been called to the bar (or

---

**5.** Del Lago asserts that these prior occasions of "undocumented" similar criminal activity should not be taken into consideration under the *Timberwalk* publicity factor. We agree with Del Lago that "unreported criminal activity on the premises is no evidence of foreseeability." *Gibbs v. Shuttleking, Inc.,* 162 S.W.3d 603, 611 (Tex.App.-El Paso 2005, pet. ref'd) (citing *Timberwalk,* 972 S.W.2d at 758–59). But we disagree with Del Lago's categorization of this prior criminal activity as "unreported" just because it is undocumented in Del Lago's records. The rationale behind the *Timberwalk* publicity factor of prior criminal activity is its role in helping to determine whether a premises owner knew or

should have known of a foreseeable danger. *Timberwalk,* 972 S.W.2d at 758. "Previous similar incidents cannot make future crime foreseeable if nobody knows or should have known that those incidents occurred." *Id.* at 759. In this case, there is no doubt that Del Lago had actual notice of these prior similar incidents; evidence of their existence came from Del Lago's security personnel, who obviously knew of them but did not document them. These prior similar incidents are properly included in our *Timberwalk* foreseeability analysis: "Actual notice of past incidents strengthens the claim that future crime was foreseeable." *Id.* at 758.

to "events" at Del Lago) [6] when arguments had broken out, approximately every two to three months; once or twice he had to separate people. Officer Moriarty admitted that they had had to "separate people" before and during fights.

Finally, Smith points to the "heated" verbal confrontations and shoving and pushing that preceded the fight for an hour and a half as prior ongoing activity that should factor in the duty analysis

because those preceding events also made this specific fight foreseeable to Del Lago. Del Lago counters that Smith was required to establish a separate and independent history of criminal activity on the premises and that the ongoing activity that evening cannot be factored in the foreseeability analysis. Del Lago cites one case that directly supports its position, but we find it to be both distinguishable and not controlling.[7] *Timberwalk* itself does not

6. Sanchez's testimony is not clear on whether he was called *to the bar* to assist when people were arguing or to "events" elsewhere at Del Lago. Because the questions preceding the use of the term "event" were about the bar, the first question using the term "event" referred to the bar, and the key event in this case concerned the bar, it can reasonably be inferred that Smith's attorney and Sanchez were referring to events in the bar:

Q By—by the way, there has been—have you been *in the bar* when they have closed The Grandstand bar?
A Yes, sir.
Q Have you participated in helping them close?
A Yes, sir.
Q Why would you do that?
A Someone from the bar would call our dispatcher and say they were getting ready to close, and there were some people that were—or some guests that were just not ready to leave; they wanted to finish their drinks.
Q And what would you do?
A Just go in and ask them if they wouldn't mind putting their drinks away; it was time for them to close the bar.
Q Do you ever remember *an event where the bartenders* were asking other patrons to help them get people to leave?
A No, sir.
Q That would be inappropriate, wouldn't it? Would it not?
A To me, it would be.
Q Have you ever had *an event* where people got into an argument where you were called in to help out?
A Yes, sir.
Q How often does that happen?
A Maybe once every two, three months.
[Emphasis added].

7. In *De Julian v. Hammock*, 2003 WL 22004947 (Tex.App.-Texarkana Aug.26, 2003, no pet.) (mem.op.), an apartment complex resident was shot in the eye with a BB gun by the complex owner's nephew, but there was no evidence the owner had knowledge of any recent assaultive conduct by the nephew. After the appellate court affirmed summary judgment for the owner, the resident urged in his motion for rehearing that the owner should have heard his nephew's hour-and-a-half BB gun shooting spree throughout the complex and that the owner should have taken action to prevent harm. The court rejected the assertion that this episode alone created a duty: "We do not believe the same series of events that led to [the resident's] injury can be used to provide notice to [the owner] of 'previous' crimes and thereby raise an issue of foreseeability of this injury." *Id.* at *4 (op. on reh'g). As Smith notes, there was no evidence the owner knew—or had notice—that his nephew was roaming the complex shooting at people; there was only the injured resident's allegation that the owner should have heard the events and taken action. *See id.* That aspect, and the owner's lack of knowledge of recent assaultive conduct by the nephew, render *De Julian* factually inapposite to the issue before us.

Other cases cited by Del Lago on this are likewise factually distinguishable: *Dailey v. Albertson's, Inc.*, 83 S.W.3d 222, 228 (Tex. App.-El Paso 2002, no pet.) (where store employee assaulted customer with box cutter, store could not foresee employee's violence based only on "verbal abuse"—one loud comment directed at customer and a later brief exchange of words, with no other evidence of criminal activity); *Gonzales v. Mobil Oil Corp.*, 2001 WL 722564, at *4–5 (Tex.App.-Dallas June 28, 2001, no pet.) (finding no duty to warn gas station customer who was shot

exclude the sequence of events that precede a crime from the foreseeability analysis; rather, whether the risk is foreseeable is determined "in light of what the premises owner knew or should have known before the criminal act occurred." *Timberwalk*, 972 S.W.2d at 757.

The gist of Smith's case is that Del Lago owed him a duty because of prior reported criminal and undocumented assaultive activity (physical and verbal confrontations) at Del Lago and because, on the occasion in question, its employees were aware (two waitresses) or should have been aware (the bartender and security officers) of the ongoing and escalating one-and-a-half hour confrontation, which posed an unreasonable risk of harm. Smith asserts that Del Lago should have taken steps to warn him or to make the condition reasonably safe, such as by the bar staff calling security before the fight broke out or otherwise intervening, or by a security presence through stationing an officer in the bar or by directed patrol through the bar. To exclude this ongoing one-and-a-half hour activity from our foreseeability analysis

would deny the reality of the facts of this case and distort the foreseeability analysis.[8] When determining whether a duty lies, we must consider all "the facts surrounding the occurrence in question." *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995).

Officer Chancellor opined that it is a good idea to get intoxicated, verbally abusive people out of a bar "because it can escalate into a fight"; he had seen it happen. Chancellor agreed that an hour and a half of threatening verbal confrontations between intoxicated men was not harmless because when they are arguing, punches can be thrown. Brandt noted that Del Lago's expert testified in his deposition that he would want security called to protect his wife if she were in a bar with verbal confrontations ongoing for an hour and a half. A reasonable person who knew or should have known of the one-and-a-half hours of ongoing "heated" verbal altercations and shoving matches between intoxicated bar patrons would reasonably foresee the potential for assaultive

based on shooter's "suspicious and unusual" conduct, which alone do not create a reasonable belief that a person has a likely propensity to commit violent criminal acts); *Yarborough v. Erway*, 705 S.W.2d 198, 200–04 (Tex. App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.) (where bar patrons bumped each other twice and then went outside, where one stabbed the other, there was no evidence of probative value that put bar employees on notice that a dangerous or threatening situation existed between the two patrons).

8. Pre-*Timberwalk* case law supports our inclusion of the ongoing activity and is not inconsistent with *Timberwalk*. *See, e.g., Polk v. Rhinestone Wrangler & K.C.O., Inc.*, 774 S.W.2d 799, 801 (Tex.App.-Texarkana 1989, no writ) (in finding duty, in addition to club's prior history of fights, court considered that, on the night of the assault in question, a fight had broken out an hour before. and security was not called, and the same persons fighting injured the plaintiff); *Ronk v. Parking Con-*

cepts of Tex., Inc., 711 S.W.2d 409, 412 (Tex. App.-Fort Worth 1986, no writ) ("The proprietor of the public business establishment has the duty to exercise reasonable care to protect his patrons from intentional injuries caused by third persons *if he has reason to know that such acts are likely to occur*, either generally or *at some particular time*.") (emphasis added) (quoting *Walkoviak v. Hilton Hotels Corp.*, 580 S.W.2d 623, 625 (Tex.Civ.App.-Houston [14th Dist.] 1979, writ ref'd n.r.e.)); *Eastep v. Jack–in–the–Box, Inc.*, 546 S.W.2d 116, 119–20 (Tex.Civ.App.-Houston [14th Dist.] 1977, writ ref'd n.r.e.) ("The portion of the rule requiring notice to the possessor that acts of violence are likely to be done does not require a long and continued course of conduct to find that the proprietor had knowledge of the violent disposition of the other patron—*all that is necessary is that there be a sequence of conduct sufficiently long to enable the proprietor to act for the patron's safety*.") (emphasis added).

conduct to occur and take action to make the condition of the premises reasonably safe.

Many of the previous incidents at Del Lago involved alcohol; Chancellor agreed. He referred to Del Lago as "Houston's playground" and said it was "typical" to see guests bringing in truckloads of alcohol through the front gate. He said that guests brought alcohol to their rooms and cottages in "enormous quantities," and Sweet said that there were intoxicated patrons in the bar every night that she worked. Del Lago's expert agreed that alcohol increases the chance of some people being more aggressive, and he conceded that alcohol probably affected behavior that night. While Smith's expert opined that common factors among the reported incidents were intoxication and violent crime, a rule that the sale of alcohol alone can establish foreseeability of violent crime would not comport with *Timberwalk*; the mere selling of alcohol does not make criminal violence against a customer foreseeable to a premises owner. *See Boggs v. Bottomless Pit Cooking Team*, 25 S.W.3d 818, 822–23 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *Donnell v. Spring Sports, Inc.*, 920 S.W.2d 378, 384 (Tex.App.-Houston [1st Dist.] 1996, writ denied). But the combination of alcohol and intoxication with the previous reported alleged crimes and undocumented incidents at the bar are part of the *Timberwalk* analysis regarding similarity.

*Analysis*

 The proximity factor in *Timberwalk* is not in real dispute: For a risk to be foreseeable, there must be evidence that other crimes have occurred on the premises or in its immediate vicinity or closely nearby. *Timberwalk*, 972 S.W.2d at 757. Implicit is that the prior criminal activity need not have occurred at the exact location of the plaintiff's injury—in this case, the bar. All fourteen of the reported alleged crimes occurred at Del Lago, as did the numerous undocumented assaultive altercations and incidents. Of the fourteen reported alleged crimes, five occurred in or just outside the bar. Chancellor had gone to the bar more than twenty-five times for physical and verbal confrontations. Sanchez said the bar had had previous fights and that he had been called there approximately every two to three months to handle arguments. And, the one-and-a-half hours of verbal confrontations and shoving matches that preceded the fight in which Smith was injured occurred in the exact location of Smith's assault.

Regarding recency and frequency, the fourteen reported violent crimes occurred within three years and seven months of Smith's injury; eleven had occurred within two years.[9] Chancellor had more than twenty-five calls to the bar and approximately twenty-five calls to the tower and cottages for physical and verbal confrontations in his six years at Del Lago; that averages to about eight incidents a year and totals around thirty for the three-and-a-half years before Smith's injury. Sanchez estimated getting called to the bar every two or three months (four to six times a year, about sixteen times for the three-and-a-half years before Smith's injury). These fourteen prior incidents of alleged violent crimes, along with the several dozen or so undocumented incidents of

---

**9.** Del Lago's expert found most of these crimes dissimilar to the assault on Smith because they were of an inter-personal or domestic nature, rather than stranger-initiated. This position was not followed—correctly, we believe—in *Dickinson Arms. See Dickinson Arms-REO, L.P. v. Campbell*, 4 S.W.3d 333, 347–49 (Tex.App.-Houston [1st Dist.] 1999, pet. denied).

assaultive conduct (physical and verbal confrontations that warranted calls to security), satisfy the recency and frequency factors. *See, e.g., Dickinson Arms–REO, L.P. v. Campbell,* 4 S.W.3d 333, 346–47 (Tex.App.-Houston [1st Dist.] 1999, pet. denied) (11 assaults in three-and-a-half years established recency and frequency); *Urena v. Western Investments, Inc.,* 122 S.W.3d 249, 255 (Tex.App.-Houston [1st Dist.] 2003 (8 violent crimes over three-year period before sexual assault established recency and frequency), *rev'd on other grounds,* 162 S.W.3d 547, 550 (Tex. 2005) (reversing because no evidence of cause-in-fact). And plainly, the one-and-a-half hours of verbal altercations and pushing that preceded the fight augments recency in this case.

The prior crimes need not be identical; they only must be sufficiently similar. In this assault case, there were fourteen prior alleged assaultive crimes, eight of which involved the bar or intoxication. Between Chancellor and Sanchez, in the three-and-one-half years before the incident in question, they responded to approximately forty-five similar undocumented altercations (physical and verbal confrontations warranting calls to security). This evidence satisfies the *Timberwalk* similarity factor.

Publicity—notice to Del Lago of the previous alleged crimes and similar assaultive conduct—is not in dispute. All of the previously documented and reported but undocumented activity occurred at Del Lago and was known by Del Lago.

Weighing the evidence using all the *Timberwalk* factors, it was foreseeable as a matter of law that an assault might occur in Del Lago's bar. *See Mellon,* 5 S.W.3d at 656–57. And on the occasion in question, it was foreseeable that Smith or a similarly situated person would be the victim of a criminal act and be harmed. *See id.* We hold that Del Lago owed a duty to Smith because of the prior reported criminal activity, the prior undocumented and similar criminal and security incidents occurring primarily in the bar but also throughout the resort, and the ongoing and escalating one-and-a-half hours of altercations in the bar leading up to the big fight.[10] We overrule Del Lago's first three issues.

## Sufficiency of the Evidence

Del Lago's fourth issue claims that the evidence is legally or factually insufficient to support the finding that it breached the alleged duty. The seventh issue asserts that the evidence is legally and factually insufficient to support the jury's negligence finding and 51%/49% apportionment of responsibility.

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 822 (Tex.2005). There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). More than a scintilla of evidence exists

---

**10.** If we were to exclude the ongoing activity from our foreseeability analysis, we would still conclude that Del Lago owed Smith a duty based on the prior documented crimes and the undocumented similar incidents.

when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (quoting *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995)). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 183 (Tex. 1995).

When the party without the burden of proof at trial complains of the factual sufficiency of the evidence to support an adverse jury finding, we must consider and weigh all of the evidence, not just the evidence that supports the verdict. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998); *Checker Bag Co. v. Washington,* 27 S.W.3d 625, 633 (Tex.App.-Waco 2000, pet. denied). We will set aside the finding only if it is so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Ellis,* 971 S.W.2d at 407. Reversal can occur because the finding was based on weak or insufficient evidence or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof. *Checker Bag,* 27 S.W.3d at 633.

On these issues, Del Lago points to the following evidence:

- Smith's security expert conceded that Del Lago's security force was significant and appropriate in size.

- No one with Del Lago felt that more security was needed.

- Del Lago did not have a reputation for violence.

- No one responsible for maintaining order in the bar left during the altercation.

- No one, including Smith, his friends, the bar staff, or bar "regulars," felt the need to call security.

- Security patrolled the bar on the night in question.

- Del Lago staff called security when the fight began, and security responded immediately.

- Smith injected himself into the fight.

According to Merlyn Moore, Del Lago's security expert, the lack of criminal history at Del Lago rendered security measures at Del Lago adequate. Moore opined that Del Lago's security met the standard of care. Moore did agree with Smith's expert, Gerald Brandt, that directed patrol (patrol directed at areas with a history of particular problems) is preferred over routine patrol, which he called a "waste of resources," but he disagreed with Brandt on whether the officers were on directed patrol that night and also with Brandt's opinion that Del Lago should have had a fixed-post patrol (where an officer would stay in the bar for a certain period of time).

Brandt, Smith's security expert, testified that ordinary care required a security officer present in the bar. He opined that Del Lago's security program was inadequate by failing to properly train staff, by failing to deploy officers through directed patrol, and by failing to provide posting directions to officers, thereby placing an officer in the bar on the night in question. Del Lago's officers were on routine patrol throughout the resort on the night in question; they both knew that the bar was crowded that night and that at the time in question, it was the only place on the resort open and serving alcohol to the public. Also, the bar staff should have notified security earlier when the verbal altercations began so that security could have defused the situation. Del Lago also should have required a security presence

during the bar's closing, which is when the fight occurred. Brandt also said that Del Lago should have warned its patrons, including Smith, that it was not supplying security for his protection.

Smith also points to the following evidence as support for the jury's finding of a breach of duty and negligence of Del Lago:

- The bar staff did not ask the participants in the "heated" verbal altercations and shoving incidents to leave the bar.
- Del Lago had not changed its security policy despite prior similar crimes and assaultive altercations.
- Security was not called when the bar staff was having trouble getting patrons to leave at closing time.
- Various witnesses testified that no security officer patrolled the bar during the one-and-a-half hours of verbal altercations and pushing and shoving.

 Viewing the above evidence in the light most favorable to the jury's verdict, it is some evidence that reasonable jurors could credit that supports the finding, and there is contrary evidence—such as Duncan's contradictory version of what happened in the bar that night and the contradictory opinion testimony of Del Lago's expert and security officers—that reasonable jurors could disregard. The evidence is legally sufficient to support the jury's finding of a breach of duty and negligence by Del Lago. And considering all of the evidence, the jury's finding is not so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. It is the jury's role to resolve conflicts in the evidence, weigh the evidence, and judge the credibility of the witnesses; we cannot substitute our opinion for the jury's. *See Dickinson Arms,* 4 S.W.3d at 349–50. The jury's apportionment of responsibility in this case reflects a fair and just weighing of conflicting evidence and the parties' positions. The evidence in this case is factually sufficient to support the jury's finding of a breach of duty and negligence, including whether Del Lago knew or reasonably should have known of the danger.[11] *See id.; Lincoln Prop. Co. v. DeShazo,* 4 S.W.3d 55, 60–62 (Tex.App.-Fort Worth 1999, pet. denied); *see also Eastep v. Jack-in-the-Box, Inc.,* 546 S.W.2d 116, 118–20 (Tex.Civ.App.-Houston [14th Dist.] 1977, writ ref'd n.r.e.). Because there is legally and factually sufficient evidence that Del Lago breached its duty and was negligent, the trial court did not err in denying Del Lago's motions for directed verdict, for JNOV, and for a new trial on these grounds. We overrule issues four and seven.

## Causation

 Issues five and six allege that there is no evidence of proximate cause. Proximate cause has two elements: cause in fact and foreseeability. *Urena,* 162 S.W.3d at 552 (citing *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992)). "These elements cannot be established by mere conjecture, guess, or speculation." *Id.* (quoting *Doe,* 907 S.W.2d at 477). The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred. *Id.* (citing *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003)). If the defendant's negligence merely furnished a condition that

___

11. In finding that the evidence satisfied the *Timberwalk* factors to establish foreseeability and a duty, we necessarily found the evidence legally sufficient to support the jury's finding that Del Lago knew or reasonably should have known of the danger. For the reasons explained in our duty discussion, that evidence is also factually sufficient to support that finding.

made the injuries possible, there can be no cause in fact. *Id.* Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his or her negligent act created for others. *Travis,* 830 S.W.2d at 98.

An expert's bare or conclusory opinion on causation is insufficient to establish causation. *Volkswagen of America, Inc. v. Ramirez,* 159 S.W.3d 897, 911–12 (Tex.2004); *Price v. Ford,* 104 S.W.3d 331, 333 (Tex.App.-Dallas 2003, pet. denied). Evidence of probative value is necessary. *Leitch v. Hornsby,* 935 S.W.2d 114, 119 (Tex.1996). Some evidence of causation exists when the plaintiff introduces evidence from which reasonable minds may conclude that it is more likely than not that the event was caused by the defendant. *See Ramirez,* 159 S.W.3d at 911; *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 459–60 (Tex.1992).

On cause in fact, Del Lago argues that it is speculation that the fight and Smith's injuries would have been prevented by either (1) the presence of security in the bar or (2) intervention by the bar staff (such as calling security to the scene or ejection of one or more of those involved) when the verbal altercations first began. Because Del Lago asserts there is no evidence of causation, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller,* 168 S.W.3d at 807, 822.

Brandt, Smith's expert, testified that Del Lago caused Smith's injuries in the following ways, among others: (1) by the bar staff's failing to notify security of the ongoing altercations so they could intervene; (2) by failing to provide security in the bar; and (3) by failing to eject the patrons involved in the conflict. Brandt said that these were all substantial factors

resulting in Smith's injuries, and if security had been present during the hour and a half, or even a few minutes before the fight, it and Smith's injuries could have been prevented. Other witnesses' testimony supports Brandt's opinions. Sweet said that if a security officer had been present during the verbal confrontations and at closing, the situation would not have progressed into the fight. Bartender Duncan said that if Sweet saw or heard verbal confrontations that night and did not report it, she not only violated Del Lago policy but also put "people in a situation that could have been avoided," and the fight "would not have occurred." Duncan said that uniformed police officers can deter just about any problem they want. And Officer Chancellor testified that uniformed officers and a security presence prevent fights, and he would have removed intoxicated patrons who were engaging in threatening behavior or pushing each other. He said that if he had known what had been going on in the bar, he would have done all he could to resolve it. All of this evidence is not speculation; it is some evidence of probative value that the lack of security and lack of intervention was a substantial factor.

Del Lago argues that the assault was sudden and spontaneous and that a security presence would not have deterred the fight in which Smith was assaulted; it principally relies on two cases that so hold, but they are fact specific and too factually distinguishable. *See Jojo's Restaurants, Inc. v. McFadden,* 117 S.W.3d 279, 281–83 (Tex.App.-Amarillo 2003, no pet.) (sudden shooting in restaurant parking lot during traffic altercation that provoked assailant); *Donnell,* 920 S.W.2d at 382–85 (sudden fight during softball game where plaintiff provoked assailant). Whether security would have prevented a crime is necessarily determined on a case-by-case basis. In

this case, there was substantial testimony about the heated hour-and-a-half confrontation that preceded the fight between the two groups in which Smith was injured; this plainly distinguishes the cases relied on by Del Lago. The absence of security and lack of intervention during that time period was a cause in fact of Smith's injuries. There is legally sufficient evidence of proximate cause. *See, e.g., Havner*, 825 S.W.2d at 461; *DeShazo*, 4 S.W.3d at 62; *Dickinson Arms*, 4 S.W.3d at 349–50; *Eastep*, 546 S.W.2d at 120. Having made this determination, we need not address Del Lago's subsidiary arguments on causation.

The trial court did not err in denying Del Lago's motions for directed verdict, for JNOV, and for a new trial as to proximate cause. We overrule issues five and six.

### Charge Error

In its eighth issue, Del Lago asserts that the trial court erroneously refused Del Lago's tendered instruction/definition on foreseeability, which reads:

"FORSEEABILITY" when used with regard to the conduct of Del Lago requires that the general danger, not the exact sequence of events that produced the harm, be foreseeable. In order to have a general danger, the evidence must reveal specific previous crimes on or near the premises in order to establish forseeability. The five factors you must consider in order to establish forseeability are: 1) proximity, 2) recency, 3) frequency, 4) similarity, 5) publicity. More specifically, you should consider whether any criminal conduct occurred at or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct in this case, and what publicity was given to the occurrences.

■■■ We review a trial court's decision to submit or refuse a particular question or instruction under an abuse-of-discretion standard. *Texas Dep't of Human Serv's. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Byrd v. Estate of Nelms*, 154 S.W.3d 149, 160 (Tex.App.-Waco 2004, pet. denied). The trial court has broad discretion in submitting jury questions and instructions. *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 791 (Tex.1995).

The trial court submitted a standard premises liability question:

Did the negligence, if any, of those named below proximately cause the occurrence in question?

With respect to the condition of the premises, Del Lago was negligent if-

a. the condition posed an unreasonable risk of harm, and

b. Del Lago knew or reasonably should have known of the danger, and

c. Del Lago failed to exercise ordinary care to protect Bradley Smith from the danger, by both failing to adequately warn Bradley Smith of the condition and failing to make that condition reasonably safe.

"Ordinary Care," when used with respect to the conduct of Del Lago as an owner or occupier of a premises, means that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances.

Answer "Yes" or "No" for the following:

A. DEL LAGO _____

B. BRADLEY SMITH _____ [12]

---

**12.** The question properly tracks the pattern jury charge question for an invitee in a prem-

ises liability case. *See* COMM. ON PATTERN JURY

Del Lago asserts that its proposed instruction closely tracks the supreme court's *Timberwalk* test for foreseeability. *See Timberwalk*, 972 S.W.2d at 756–57. But that test is for the court's threshold legal determination whether the premises owner owed the plaintiff a duty. *See id.* at 756–59. Del Lago then argues, without citing any authority on point, that this question erroneously asked, in part, whether Del Lago knew or reasonably should have known of the "danger" without defining the "danger" and without explaining the foreseeability component of "reasonably should have known."

■■ Well-settled jury charge definitions and pattern jury charges should not "be embellished with addendum." *Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex.1984); *see Ramirez v. H.E. Butt Grocery Co.*, 909 S.W.2d 62, 65 (Tex.App.-Waco 1995, writ denied). The trial court did not abuse its discretion in refusing Del Lago's requested jury instruction on foreseeability. We overrule issue eight.

## Conclusion

Because the trial court did not err in denying Del Lago's motions for directed verdict, for JNOV, and for a new trial on issues one through eight, we overrule issue nine. Having overruled all of Del Lago's issues, we affirm the trial court's judgment.

Chief Justice GRAY dissenting.

TOM GRAY, Chief Justice, dissenting.
Well, it's not right to go into details, I got nervous. I screwed up, I said the wrong thing ... Where if I hadn't, I could be in bed right now with a woman who, if you make her laugh, you got a life. Instead I'm here with you *[ges-*

*tures to bartender]* ... No offense, but a moron pushing the last legal drug.[1]

If our task is to prohibit "pushing the last legal drug," the majority has gone a long way to accomplishing that task. By holding events in a place larger than just the bar, where people have, on occasions in the past, engaged in illegal activity, the majority has imposed upon a bar's owner the duty to protect its patrons from the illegal activity of others.

So this case is about that duty. The duty of a premises owner/occupier to protect an invitee from the criminal conduct of another invitee or third party. In finding a duty, the majority makes some interesting law. The law they make to determine there is a duty, however, is not supported by existing precedent.

This dissenting opinion will first focus, albeit briefly, on the unusual aspects of what the majority has done, comment on other aspects of the appeal, and then provide what I believe is the analysis for a proper disposition of determining whether Del Lago owed Smith a duty to prevent the attack resulting in his injuries.

## THE BACKGROUND

To understand where I am going, it will be helpful to know that Smith was at a reunion of fraternity brothers. They were in a bar at Del Lago. A wedding party came into the bar. After an extended period of alcohol consumption and displays of testosterone, it was time for the bar to close. After the closing and during the exit from the bar, there was what can best be described as a brawl between the wedding party and the fraternity brothers. One of the fraternity brothers, Smith, had his head, somewhat face first, rammed into

CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES, PJC 66.4 (2003).

1. *As Good As It Gets* (TriStar Pictures 1997) (motion picture).

a wall. Though initially declining medical treatment, Smith's injuries were quite serious. Ultimately, he sued Del Lago.

To find a duty, the following three questions are answered in the affirmative by the majority opinion:

1. Can we use generic, undefined, unspecified past events upon which to determine a duty in conducting a *Timberwalk* analysis?
2. Can we use the events from which the injury arose in determining the existence of a duty in conducting a *Timberwalk* analysis?
3. Can we use, and if so, how do we use, an expert's testimony in determining the existence of a duty in conducting a *Timberwalk* analysis (as opposed to the breach of the duty if one is determined to exist)?

### CONSIDERING VAGUELY REFERENCED EVENTS

Smith's expert and the majority put a lot of emphasis on a number of other vaguely described incidents. Because the incidents referred to are vague, particularly in reference to an analysis under the *Timberwalk* factors, *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756–759 (Tex.1998), I believe it is improper to put the level of reliance upon them that the majority does. I note in all the incidents, including the ones on which reports were prepared, there is only one in which a large number of persons were involved, like this incident, and it was not in the bar. I also note there is a serious question about which, if any, of these vague incidents were criminal conduct, particularly involving violent conduct resulting in an assault.

### CONSIDERING THE EVENTS LEADING TO INJURY TO DETERMINE DUTY[2]

Smith's expert and the majority put great emphasis on the events of the evening prior to the brawl. The problem with this reliance is that the duty existed or did not exist before the evening began. Anything about events that happened over the course of the evening are about a breach and causation once a duty is determined to exist. I believe it is error to factor this into the duty analysis. One of the problems with factoring the night's events into the analysis will be how the preliminary events are viewed. These preliminary events could just as easily be viewed as confirmation that no duty should exist because the nature of the confrontations between the members of the two groups over the two hours before the injury did not result in any injury or need for intervention by security. Those events certainly did not result in any illegal activity resulting in an injury to an invitee.

### CONSIDERING EXPERT TESTIMONY

In some areas, the determination of duty may be assisted by an expert. The question becomes what are the areas in which an expert can be used? I believe that premises liability is not such an area in which an expert should be used to determine the existence of a duty and that the expert testimony should not have been considered at trial or in this appeal. Only

---

**2.** I like how the majority characterizes this aspect of the evening's events leading to a duty. "The gist of Smith's case is that Del Lago owed him a duty ... because, on the occasion in question, its employees were aware (two waitresses) or should have been aware (the bartender and security officers) of the ongoing and escalating one-and-a-half hour confrontation, which posed an unreasonable risk of harm." Maj. Op. at 157. It seems to me if these events posed such an obvious risk of harm that any reasonable person would have removed himself from the danger; instead, Smith not only voluntarily stayed, he voluntarily entered the fracas after it began.

when expert testimony is required based on the nature of the case would I allow an expert to participate in the determination of the existence of a duty. The classic example of this is probably medical malpractice cases. But when, as here, the duty is going to be determined by ordinary reasonableness standards, what does an expert add? In this particular context, that of liability of a premises owner or occupier, if a security expert is utilized to determine the existence of a duty, every owner or occupier of property would need to engage the services of a security expert to advise them whether, and to what extent, they owe a duty of security to persons who may enter upon their premises. I would not impose such a burden on every property owner.

Essentially, we now have an expert on what constitutes a reasonable person. The premise on which we use experts is they have specialized knowledge, skill, or training. If we use an expert to determine what a reasonable person would have done, known, or been made aware of by certain events, we have required every premises owner to become an expert in the security of the premises from the illegal acts of third persons. The reason the person qualifies as an expert is because they may take facts that a reasonable person would not infer anything from. But an expert may be able to, based upon his training and experience, infer a risk or recognize, when joined with other factors presented, the presence of an unreasonable risk of harm.

Finally, since the duty is a question of law, decided de novo by the appellate court, what would be the proper scope of our review? Are we limited to the record that was before the trial court? Or can we have our own 702/ *Daubert* hearing to determine 1) whether we are really dealing with a proper area for expert inquiry, 2)

whether the alleged expert is really an expert, and 3) whether the expert properly evaluated the issue under investigation; or is it just a review of some facts and a bare conclusion of the alleged experts? *See* Tex.R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For these reasons, I do not believe this is a proper area of inquiry for use of an expert, and the majority errs in placing such heavy reliance on the expert's testimony to determine the existence of a duty.

## OTHER ISSUES/OBSERVATIONS

I also have grave doubts, because the geographic area from which the incidents used by the majority to find a duty is so large, that it could then be found to have been a breach of that duty by not having a security officer within the bar. The security officers were on the larger Del Lago premises, and they arrived in the bar within minutes of when the brawl started. If the reviewing court uses the events occurring in all of Del Lago to find a duty owed to the bar patron, we must evaluate the breach and proximate cause issues within the context of that duty to patrol the larger geographic area. The frequency of assaults requiring security intervention due to injury or criminal conduct, many sexual or domestic relations in nature, occurred much more frequently in the areas security was actually patrolling than within the bar where Smith, his expert, and the majority wants them to stay.

## MY ANALYSIS

This is a premises liability case in which Bradley Smith sued Del Lago Partners, Inc., for negligence regarding severe injuries he sustained in a bar fight while staying at the Del Lago Resort in Montgomery County. The jury assessed Del Lago's negligence at 51% and allocated 49% to

Smith. Del Lago appealed. Because the criminal act committed on Smith was not reasonably foreseeable, Del Lago had no duty to protect Smith from the criminal conduct of a third person. The trial court's judgment should be reversed, and a judgment should be rendered that Smith take nothing. Because the majority does neither, I dissent.

During a fight among patrons in the Grandstand Bar at the resort, Smith was placed in a headlock and thrown into a wall, head-first. When security arrived minutes later, everyone involved in the fight, including Smith, had left the bar. Smith discovered several days later that he had severe head injuries.

Del Lago contends on appeal that it had no duty to protect Smith from the criminal acts of others because the criminal act committed on Smith was not foreseeable. Whether a duty is owed by one person or entity to another is a question of law for the court to decide. *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 756 (Tex.1998). A duty exists only when the risk of criminal conduct is so great that it is both unreasonable and foreseeable. *Id.* The jury is asked to determine breach and proximate cause only after the court has concluded that a duty exists. *Otis Engineering Corp. v. Clark,* 668 S.W.2d 307, 312 (Tex.1983) (McGee, J., dissenting).

In the *Timberwalk* opinion, the Texas Supreme Court discussed extensively the concept of foreseeability when determining whether a property owner has a duty to protect another from the criminal acts of a third party. That discussion is found in Part III, Section A in the opinion. *Tim-*

*berwalk,* 972 S.W.2d at 756–759. A complete discussion of the factors used by the courts to determine foreseeability is found in Section A, subsections 1–4. *Id.* at 757–759.

The parties introduced evidence that within five years of the criminal act against Smith, eleven incidents occurring on Del Lago's property were reported to either Del Lago's security or the Montgomery County Sheriff's Office.[3] Three of those eleven were possible sexual assaults. The other eight incidents involved other types of assaultive conduct. Two incidents involved domestic violence. One was a verbal confrontation on the golf course. One report mentioned a fight, but did not describe any physical contact or injuries. The other four reports involved either no injuries or only minor injuries. Three of these four incidents occurred at the Grandstand Bar. One occurred in 1998; one occurred in 1999; and one occurred in 2000.

Applying the *Timberwalk* factors to the evidence before the Court, I conclude that the risk of a criminal act occurring in the Grandstand Bar resulting in injury, to the extent that occurred, to Smith was not foreseeable.[4] Therefore, Del Lago did not owe a legal duty to Smith to protect him from the criminal acts of a third party.

The disposition of this issue eliminates the need to discuss any other issues raised by Del Lago.

The trial court's judgment should be reversed, and judgment should rendered that Smith take nothing against Del Lago. Because the majority does neither, I dissent.

---

**3.** The majority separates some of the complaints that were written up on a single report. It is unclear whether Del Lago was aware of the incidents reported by the Montgomery County Sheriff's Office. For a summary of the events, see Appendix A.

**4.** Smith relies on the opinion in *Dickinson Arms–REO, L.P. v. Campbell,* 4 S.W.3d 333 (Tex.App.-Houston [1st Dist.] 1999, pet. de-

nied) for his argument that the conduct and injury were foreseeable. But *Dickinson Arms–REO* is distinguishable. The prior criminal acts on and surrounding the property were much more severe, and the appellant did not challenge the duty element of negligence on appeal. Having no need to review whether or not a duty was owed to the victim, the foreseeability element in *Dickinson Arms–REO* was reviewed as a part of the proximate

## APPENDIX A

| Plaintiff # | Defendant # | |
|---|---|---|
| 57 | 49 | Del Lago Incident Report<br>Offense: Assault<br>Date: 11/16/97<br>Area: Hall area by gift shop & Lago Vista<br>Details: Female sitting on couch, crying. Said husband hit her and knocked her down. Husband went back to bar. Upon talking to husband, found out wife hit him two times in face & walked out of bar. Husband followed & jerked her around by hair & knocked her to ground.<br>Three males came from bar while investigation going on & were creating problems for Del Lago officers. MCSO was called. Three subjects finally left. Husband & wife eventually arrested. |
| 58 | 50 | Del Lago Incident Report<br>Offense: Assault<br>Date: 9/20/98<br>Location: Grandstand Bar<br>Details: Security officer helping clear bar; noticed large group of males near rear doors, fighting. Two groups shouting obscenities at each other. Officer proceeding to break it up. One person said he'd been punched in the face – didn't want to press charges. Officer told both groups to leave; groups began to verbally antagonize each other. Several men began to curse officer. Scene turned over to property police when he arrived. |
| 63 | 55A&B | MCSO Report<br>Offense: Assault/Bodily Injury<br>Date: 1/1/99<br>Location: Del Lago Cottage<br>Details: Victim reported she was assaulted at a new year's eve party by a person (another girl) she knew from high school. Defendant was intoxicated & told victim to leave party. When victim didn't right away, Defendant struck her in the face. Defendant had to be restrained. Defendant left the party. Defendant wants to press charges. At time of report, no visual signs of victim being struck. Victim, though, never showed up to give statement, so case cleared by lack of prosecution by victim. |
| 62<br>(corresponds to #67) | 51<br>(corresponds to #57) | Del Lago Incident Report<br>Offense: Possible Rape<br>Date: 7/5/99<br>Location: Room on property<br>Details: Complainant said she was very intoxicated the night before & woke up in a different room with her shorts down around her knees. Didn't know the three men in the room. Didn't know if she'd been raped. Taken to Conroe Regional Medical Center to have rape kit done. Not the first time officers encountered this victim. At 2:30 a.m., victim was in confrontation with friend in front of conference center; very intoxicated. Later saw victim at 6:00 a.m. in front of tower lobby. |
| 67<br>(corresponds to #62) | 57<br>(corresponds to #51) | MCSO Report<br>Offense: Sexual Assault<br>Date: 7/5/99<br>Location: Unknown<br>Details: Victim was 34 year old white female; listing of evidence seized – including empty beer bottles & cans & empty Jack Daniels ½ gallon bottle. |
| 64 | 58A&B | MCSO Report<br>Offense: Assault/Bodily Injury<br>Date: 8/29/99<br>Location: Hotel/Bar<br>Details: Security officer assaulted by patron. Defendant was intoxicated. Became belligerent & tried to start fights with others. Defendant was asked to leave bar – |

cause element of negligence. This distinction is important because proximate cause is a fact issue to be determined by the jury and duty is a legal issue to be resolved by the court. The methods and standards of review are different.

| Plaintiff # | Defendant # | |
|---|---|---|
| | | Defendant became angry & tried to fight. Began elbowing security officer in the ribs repeatedly. Earlier, while employee was trying to get Defendant to leave the bar, Defendant grabbed employee's neck & was positioning himself to hit employee. Security officer then stepped in to put Defendant in a head lock & that's when he was elbowed. |
| 66 | 56 | MCSO Report<br>Offense: Sexual Assault<br>Date: 6/26/99<br>Location: Unknown<br>Details: Case referred by HPD; victim was 24 year old white female. No billed by grand jury. |
| 65 | 59A&B | MCSO Report<br>Offense: Assault/Bodily Injury (FV)<br>Date: 7/23/00<br>Location: Hotel<br>Details: Patron was assaulted by his girlfriend in their hotel room. Both were intoxicated & they started arguing. Girlfriend then attacked victim scratching, punching, & biting him. Girlfriend arrested. Victim signed no prosecution request. |
| 60 | 52 | Del Lago Incident Report<br>Offense: Fight Behind Tower<br>Date: 8/13/00<br>Location: Property behind Tower<br>Details: Security officer responded to call on fight in progress. Observed 8-10 people in verbal confrontation. Learned fight had taken place with someone in another room. Property police arrived & told everyone to go back to their rooms. Later called to 18th floor to fight in progress involving same guests. One guest was moved to a different room. |
| 59 | 53 | Del Lago Incident Report<br>Offense: N/A (Medical Emergency)<br>Date: 10/26/00<br>Location: Grandstand Bar<br>Details: Property officers called to Grandstand Bar because of a fight between patrons. Found 65 year old white male on floor complaining of pain in lower back & left rib cage. Patron was intoxicated & unruly. Employees said victim was playing pool with another & pushed the man in the chest. The man pushed back, knocking victim to the floor. Man left scene before MCSO arrived so no police report filed. |
| 68 | 60 | MCSO Report<br>Offense: Sexual Assault<br>Date: 11/4/00<br>Location: Unknown<br>Details: Victim is 34 year old white female; camera & bedspreads seized. |
| 61 | 54 | Del Lago Incident Report<br>Offense: Fight Between Golfers<br>Date: 5/20/01<br>Location: Golf Course<br>Details: Called to golf course for possible assault. One golfer let another (2nd) play through and then found that the 2nd golfer played one hole two times. When confronted, the other (2nd) golfer said he fought dirty & then raised golf club. Then club dropped. When 2nd golfer approached again, police called again. Nothing happened. Golfers told to avoid each other. |